UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



- - - - - - - - - - - - - - - - - - - -

ASSURED GUARANTY MUNICIPAL
CORP., F/K/A FINANCIAL SECURITY
ASSURANCE INC.,

                Plaintiff,

     - against -

UBS REAL ESTATE SECURITIES INC.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:
:
:

12 Civ. —CV  1579

Removed from:

Supreme Court of the State of New
York, County of New York,
Index No. 650327/2012)

RECEIVED
MAR 05 2012
U.S.D.C. S.D. N.Y.
CASHIERS

### NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT Defendant UBS Real Estate Securities Inc.,

pursuant to 28 U.S.C. §§ 1441(a) and 1446(a), hereby removes this action from the Supreme

Court of the State of New York to the United States District Court for the Southern District of

New York. In support of its Notice of Removal, Defendant states as follows:

        1.     On or about February 2, 2012, Plaintiff filed a complaint ("Complaint") in

the Supreme Court of the State of New York, County of New York (the "State Court") entitled

*Assured Guaranty Municipal Corp., f/k/a Financial Security Assurance Inc. v. UBS Real Estate*

*Securities Inc.*, Index No. 650327/2012 (the "State Court Action").

        2.     On February 3, 2012, Plaintiff served the summons and Complaint on

Defendant. In accordance with 28 U.S.C. § 1446(a) and Rule 81.1(b) of the Local Civil Rules of

the United States District Court for the Southern District of New York, copies of the summons

and Complaint, along with a stipulation between Plaintiff and Defendant extending Defendant's

time to appear, answer or move against the summons and Complaint (the "Stipulation"), are attached hereto as Exhibit A.

3.      Pursuant to the Stipulation, Defendant's time to appear, answer or move against the summons and Complaint has not expired and Defendant has not served or filed an answer.

4.      No motions or other proceedings in this action are pending in the State Court.

5.      Written notice of the filing of this Notice of Removal will be served on counsel for Plaintiff and a copy of this Notice will be filed with the Clerk of the Supreme Court of the State of New York, County of New York, as required by 28 U.S.C. § 1446(d).

6.      This Notice of Removal is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

7.      This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is being filed within 30 days after service of the summons and Complaint.

8.      This Court has original jurisdiction over this action under 28 U.S.C. §§ 1334(b) and 1452(a) because this action is "related to" bankruptcy proceedings under Title 11 of the United States Bankruptcy Code.

9.      The Complaint alleges that Plaintiff provided financial guaranty insurance on certain classes of three residential mortgage-backed securities certificates for which Defendant served as sponsor: (i) MASTR Adjustable Rate Mortgages Trust 2006-OA2 ("MARM 2006-OA2"); (ii) MASTR Adjustable Rate Mortgages Trust 2007-1 ("MARM 2007-1"); and (iii) MASTR Adjustable Rate Mortgages Trust 2007-3 ("MARM 2007-3") (collectively, the "Certificates").

2

10.     The Complaint also alleges that the Certificates were riskier than Defendant represented to Plaintiff and the holders of the Certificates, and purports to bring claims for common law breach of contract and declaratory judgment.

11.     The Certificates are backed by mortgages originated by bankrupt entities which owe Defendant contractual and/or statutory or common law indemnification or contribution for any claims arising from actual or alleged material misstatements or omissions regarding the mortgage loans that underlie a portion of the Certificates, as well as certain legal expenses arising from such claims.

12.     For example, the MARM 2007-1 Certificate is backed by loans originated by American Home Mortgage Corp. ("American Home").  American Home made representations regarding loan underwriting standards and the nature of the mortgage loan collateral for the MARM 2007-1 offering.

13.     On August 6, 2007, American Home filed a voluntary petition for relief under Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, Master Docket No. 07-11047.  This proceeding remains open and within the jurisdiction of the Bankruptcy Court.

14.     Defendant has asserted timely proofs of claim against American Home based on written agreements containing indemnification provisions for the benefit of Defendant, among others, in connection with the MARM 2007-1 Certificate.

15.     Pursuant to written indemnification agreements and statutory and common law indemnification and/or contribution rights, American Home owes Defendant indemnification and/or contribution for any claims arising from actual or alleged material misstatements or

omissions made by American Home regarding the mortgage loans that underlie a portion of the MARM 2007-1 Certificate, as well as certain legal expenses arising from such claims.

16.    A case is "related to" bankruptcy if "its outcome might have any 'conceivable effect' on the bankrupt estate." *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992).  This action relates to American Home's bankruptcy proceedings because American Home would owe Defendant indemnity and/or contribution obligations that could affect the debtor's property in the event a loss is sustained by Defendant in connection with this action with respect to the MARM 2007-1 Certificate, including but not limited to any costs and expenses incurred by Defendant to defend against this action.

17.    Accordingly, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1334(b), and this action may be removed to this Court by Defendant pursuant to 28 U.S.C. § 1452(a) because this action is "related to" bankruptcy proceedings under Title 11 of the United States Bankruptcy Code. *See Abbatiello v. Monsanto Co.*, 06 Civ. 266 (KMW), 2007 U.S. Dist. LEXIS 19790, at *12-14 (S.D.N.Y. Mar. 5, 2007); *see also Mass. Bricklayers & Masons Trust Funds v. Deutsche Alt-A Sec., Inc.*, 399 B.R. 119, 121-23 (E.D.N.Y. 2009); *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, 572 F. Supp. 2d 314, 315, 318-19 (E.D.N.Y. 2008).

18.    As required under Rule 9027(a)(1) of the Federal Rules of Bankruptcy Procedure, Defendant state that the claims asserted against it are non-core with the meaning of 28 U.S.C. § 157(b) and that it does not consent to entry of final orders or judgment by the bankruptcy judge.

19.     By filing this Notice of Removal, Defendant does not waive any defense that may be available to it and does not concede that the allegations in the Complaint state a valid claim under applicable law.

WHEREFORE, Defendant respectfully requests that the State Court Action now pending in the Supreme Court for the State of New York, Index No. 650327/2012, be removed therefrom to this Court.

Jay B. Kasner
Scott D. Musoff
Robert A. Fumerton
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
(212) 735-3000
jay.kasner@skadden.com
scott.musoff@skadden.com
robert.fumerton@skadden.com

*Attorneys for Defendant UBS Real Estate
   Securities Inc.*

Dated:   New York, New York
         March 5, 2012

Exhibit A

FILED: NEW YORK COUNTY CLERK 02/02/2012

NYSCEF DOC. NO. 1

INDEX NO. 650327/2012

RECEIVED NYSCEF: 02/02/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ASSURED GUARANTY MUNICIPAL
CORP., F/K/A FINANCIAL SECURITY
ASSURANCE INC.,

                      Plaintiff,

              -against-

UBS REAL ESTATE SECURITIES INC.

                   Defendant.

Index No. _____

**SUMMONS**

TO THE ABOVE-NAMED DEFENDANT:

        YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer on Plaintiff's attorneys within (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York). In case of your failure to appear, judgment will be taken against you by default for the relief demanded in the complaint.

        Plaintiff designates New York County as the place of trial. Venue is proper in this Court pursuant to the N.Y.C.P.L.R. 503 because the principal office of the Defendant is located in New York County.

DATED:  New York, New York
February 2, 2012

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _____
Philippe Z. Selendy
Adam M. Abensohn
Nicholas F. Joseph

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849 7000

*Attorneys for Assured Guaranty Municipal
Corp. f/k/a Financial Security Assurance
Inc.*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ASSURED GUARANTY MUNICIPAL CORP., F/K/A FINANCIAL SECURITY ASSURANCE INC., | |
| Plaintiff, | Index No. _____ |
| -against- | **COMPLAINT** |
| UBS REAL ESTATE SECURITIES INC. | |
| Defendant. | |

Plaintiff Assured Guaranty Municipal Corp., f/k/a Financial Security Assurance

Inc. ("Assured"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Complaint

against UBS Real Estate Securities Inc. ("UBS Real Estate") alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of contract and declaratory relief stemming from UBS

Real Estate's failure to abide by its unambiguous contractual obligations under the Pooling and

Servicing Agreements ("PSAs"), and its material breaches of conditions precedent in the

commitment letters, relating to three residential mortgage loan securitization transactions. UBS

Real Estate assembled those securitizations from thousands of residential mortgage loans and, as

an inducement to investors and insurers, represented, among other things, that those mortgage

loans met specified quality control standards and were underwritten according to applicable

guidelines. UBS Real Estate's representations were false, and, as a result, Assured has sustained

and will continue to sustain substantial damages.

2.      In its role as sponsor of the securitizations, UBS Real Estate acquired the

underlying mortgage loans, which it subsequently conveyed to three separate trusts. Those

trusts, in turn, issued residential mortgage-backed securities ("RMBS" or "Certificates"), which

1

were marketed and sold to investors in three offerings in 2006 and 2007. The RMBS at issue
are: (i) MASTR Adjustable Rate Mortgages Trust 2006-OA2 (the "2006-OA2 Transaction");
(ii) MASTR Adjustable Rate Mortgages Trust 2007-1 (the "2007-1 Transaction"); and
(iii) MASTR Adjustable Rate Mortgages Trust 2007-3 (the "2007-3 Transaction") (collectively,
the "Transactions"). To make the Transactions more marketable, UBS Real Estate sought a
financial guaranty insurer to guarantee the trusts' payments to investors on certain classes of the
senior Certificates in the event that payments on the underlying mortgage loans were insufficient.

   3.  To secure Assured's agreement to provide this insurance, UBS Real Estate made
a comprehensive set of representations and warranties in the PSAs governing these Transactions,
vouching for the quality of the mortgage loans (the "Mortgage Representations"). Among other
things, UBS Real Estate represented and warranted that: (i) the information in the mortgage loan
schedules was true and correct in all material respects; (ii) the mortgage loans were underwritten
in accordance with the underwriting guidelines of the originators of the mortgage loans (the
"Underwriting Guidelines"); and (iii) with respect to certain of the mortgage loans in the 2006-
OA2 and 2007-1 Transactions, the lender made a reasonable determination that at the time of
origination the borrower had the ability to make timely payments on each mortgage loan. UBS
Real Estate further agreed to cure, repurchase, or replace mortgage loans that breached these
representations and warranties with mortgage loans that satisfied them.

   4.  During the fourth quarter of 2009, faced with mounting claim payments caused by
liquidated mortgage loans in the Transactions, Assured began obtaining and examining loan files
and other documentation associated with thousands of the mortgage loans pursuant to its rights
under the PSAs. This forensic re-underwriting revealed that UBS Real Estate materially and
pervasively breached its Mortgage Representations, thereby overstating the quality of the

mortgage loans collateralizing each Transaction and understating the risk to Assured that it would be required to pay claims under its financial guaranty insurance policies. Although UBS Real Estate represented to Assured that the mortgage loans underlying the Transactions were underwritten pursuant to the Underwriting Guidelines, designed to ensure that borrowers would repay the mortgage loans, this review revealed that the mortgage loans did not have the characteristics represented on the mortgage loan schedules for the Transactions, were made to borrowers who could not afford to repay them, who committed fraud in their loan applications, or who otherwise did not satisfy the basic risk criteria for prudent and responsible lending.

5.      As of December 15, 2011, Assured has reviewed 2,945 delinquent and liquidated mortgage loans with an aggregate original principal balance of $1,173,390,439. A staggering percentage of these mortgage loans breached one or more Mortgage Representations: at least 90 percent of the $67,749,565 original principal balance of mortgage loans in the 2006-OA2 Transaction, at least 81 percent of the $832,029,261 original principal balance of mortgage loans in the 2007-1 Transaction, and at least 95 percent of the $273,611,613 original principal balance of mortgage loans in the 2007-3 Transaction. The mortgage loans, and consequently, the Transactions themselves, were far riskier than UBS Real Estate represented to Assured and the holders of the Certificates (the "Certificateholders").

6.      By making the Mortgage Representations, UBS Real Estate assumed the risk that the mortgage loans did not conform to those Mortgage Representations, whereas Assured assumed only the risk that mortgage loans that did conform to those Mortgage Representations would not perform. In agreeing to provide financial guaranty insurance, Assured relied on UBS Real Estate's Mortgage Representations and the accuracy of the information UBS Real Estate provided to Assured. UBS Real Estate's deception enabled it to sell pools of mortgage loans in

3

the Transactions that present a materially greater risk of delinquency and default, and in fact have become delinquent and defaulted, at higher rates than would have occurred had the mortgage loans met the criteria indicated in the Mortgage Representations. Indeed, if UBS Real Estate had truthfully described the quality of the mortgage loans in the Transactions, Assured would not have agreed to issue its financial guaranty insurance policies.

      7.      Between August 9, 2010 and December 15, 2011, Assured requested that UBS Real Estate cure or repurchase a total of 2,440 defective mortgage loans with an original unpaid principal balance of approximately $997,842,635 across all three Transactions: 167 defective mortgage loans in the 2006-OA2 Transaction with an original principal balance of $61,295,315, 1,616, defective mortgage loans in the 2007-1 Transaction with an original principal balance of $676,060,519, and 657 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $260,486,801. UBS Real Estate has refused to repurchase all but a small fraction of these defective mortgage loans within the 90-day cure or repurchase period, despite its contractual obligation to do so. UBS Real Estate's refusal to repurchase these defective mortgage loans leaves Assured uncompensated for its losses.

      8.      UBS Real Estate's widespread and pervasive breaches of contract have inflicted and continue to inflict tremendous harm on Assured. As of December 31, 2011, large percentages of the current mortgage loan pools backing Assured's insured certificates in the Transactions had been delinquent for at least sixty days: 50 percent in the 2006-OA2 Transaction, 34 percent in the 2007-1 Transaction, and 52 percent in the 2007-3 Transaction. But, as of December 31, 2011, Assured had received aggregate premium payments of approximately $3,121,430.71 across the Transactions. This is grossly out of proportion with risks inherent in the faulty loans that UBS Real Estate actually selected for inclusion in the

4

Transactions. As of January 31, 2012, Assured had paid approximately $308,200,701 in aggregate claims: approximately $129,576,296 in the 2006-OA2 Transaction, approximately $90,788,332 in the 2007-1 Transaction, and approximately $87,836,072 in the 2007-3 Transaction – almost 100 times greater than the aggregate premiums it has received to date. Assured remains exposed to tens of millions of dollars in further claim payments under its financial guaranty insurance policies.

9.     Because Defendant's breaches have deprived Assured of the benefit of its bargain, Assured is entitled to be restored to the position it would have been in had it not issued its financial guaranty insurance policies, including through the recovery of damages for the full amount of its exposure under those policies.

## PARTIES

10.     Plaintiff Assured Guaranty Municipal Corp. is incorporated in New York with its principal place of business at 31 West 52nd Street, New York, NY 10019. Assured is a financial guaranty insurance company currently focused exclusively on the public finance market. Assured is licensed in all 50 states, the District of Columbia, and Puerto Rico. Prior to July 2009, Assured was known as Financial Security Assurance Inc.

11.     Defendant UBS Real Estate Inc. is incorporated in Delaware with its principal place of business at 1285 Avenue of the Americas, New York, NY 10019. UBS Real Estate is engaged in a variety of capital markets related activities, including purchases and sales of loan portfolios, sales of assets for inclusion in securitizations, and origination and acquisition of loans.

## RELEVANT NON-PARTIES

12.     UBS Securities LLC ("UBS Securities") is a limited liability company incorporated in Delaware with principal places of business at 677 Washington Boulevard, Stamford CT 06901 and 299 Park Avenue, New York, NY 10171. UBS Securities is one of the

leading underwriters in mortgage and asset-backed securities in the United States. UBS Securities served as underwriter of the securities issued in each of the Transactions.

13.     Mortgage Asset Securitization Transactions, Inc. ("MAST") is a Delaware corporation with its principal place of business at 1285 Avenue of the Americas, New York, NY 10019. MAST is a wholly-owned limited purpose subsidiary of UBS Americas, Inc. In its role as the depositor on each of the Transactions, MAST received the underlying mortgage loans from UBS Real Estate, and then transferred those mortgage loans to a trust created for each Transaction.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this proceeding pursuant to CPLR 301 and 302. Defendant's principal place of business is in New York. Defendant participated in negotiations and other activities within this State which led to the transactions that give rise to the claims in this Complaint, and the transactions themselves occurred within this State.

15.     Venue is proper in this Court pursuant to CPLR 503. Defendant's principal place of business is in New York County. Negotiations and other substantial activities relating to the transactions that give rise to the claims in this Complaint occurred within New York County.

## FACTUAL ALLEGATIONS

### A.     Residential Mortgage Backed Securities

16.     Asset-backed securities distribute risk and return to investors by pooling cash-producing financial assets, such as mortgage loans, and issuing securities backed by the pool of underlying assets.

17.     The most common form of securitization of residential mortgage loans involves a sponsor and the creation of a trust, to which the sponsor sells a portfolio of mortgage loans. In many instances, the transfer of assets to a trust "is a two-step process: the financial assets are

transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions." SEC Release "Asset-Backed Securities" (Regulation AB), SEC Release Nos. 33-8518; 34-50905, 70 Fed. Reg. 1,506, 1,511 (Jan. 7, 2005).

18. After receiving the portfolio of residential mortgage loans, the trust will issue RMBS using the pool of residential mortgage loans as collateral. By purchasing those securities, known as Certificates, investors acquire rights to the cash flowing from the pool of residential mortgage loans owned by the trust. This cash is generated by borrowers' payments of principal and interest on the mortgage loans held by the trust.

19. To decrease the risk to Certificateholders from a shortfall in mortgage loan payments to the trust, and thereby to make the securitizations more marketable, many securitizations include additional credit enhancement for all or some of the Certificates in the form of a financial guaranty insurance policy. Under the terms of such a policy, a financial guaranty insurer, in return for a premium, guarantees to all or some of the Certificateholders that, in the event cash flows from the mortgage loans are insufficient to make specified payments of interest and principal to the insured Certificates, the financial guaranty insurer will cover those shortfalls and, in some cases, other losses. In this way, the risk to the investors in insured Certificates of a shortfall in the anticipated cash flows from the pool of mortgage loans to the trust is mitigated.

20. The presence of financial guaranty insurance increases the value of a residential mortgage-backed security. The decision by an insurer to provide such protection, and its assessment of the risks in doing so, depends largely on the quality of the underlying collateral—

7

namely, the residential mortgage loans. If, for instance, the lender that originated the mortgage loans employed substandard underwriting practices, and thereby allowed mortgage loans to be extended to borrowers who would not or could not repay them, risk of non-payment on those mortgage loans increases. Based on its assessment of the risk of impaired cash flows, a financial guaranty insurer may decide not to provide insurance on a particular transaction.

21.     To secure financial guaranty insurance, as well as to make the transactions more appealing to investors, sponsors of securitizations make extensive representations and warranties in the transaction documents concerning the quality of the underlying mortgage loans, to entice both investors and financial guaranty insurers. Sponsors also routinely covenant in the applicable contracts that, if mortgage loans fail to conform to the sponsor's representations and warranties in a manner that materially and adversely affects the interests of the Certificateholders or the financial guaranty insurer, the sponsor must replace the defective mortgage loans, cure the defects, or repurchase the defective mortgage loans within a specified time period (typically 90 days).

22.     As part of the securitization process, sponsors provide rating agencies and potential financial guaranty insurers with mortgage loan tapes containing data regarding key characteristics of the mortgage loans to be included in the securitization, including (i) each borrower's Fair Isaac & Co. ("FICO") score; (ii) the appraised value of the mortgaged property; (iii) the loan-to-value ratio ("LTV ratio"), which is the ratio of the mortgage loan amount to the appraised value of the mortgaged property; and (iv) the debt-to-income ("DTI") ratio, which is the ratio of the borrower's monthly debt to income.

23.     Rating agencies then use this information to create expected default and loss estimates. These estimates, in turn, are used to generate cash flow projections for the classes of

8

securities in the securitization. On the basis of the expected losses and credit enhancement for the proposed securitization, the rating agency will provide a so-called "shadow rating" for the classes of securities in the securitization that are covered by financial guaranty insurance. This shadow rating represents the rating these classes of securities would carry without the financial guaranty insurance.

**B.      UBS's Securitization Business and Bad Acts Related to the Transactions**

24.      UBS Real Estate was a huge player in the RMBS markets from 2004 until late 2007, when the market collapsed. As stated in the Prospectus Supplement for the 2007-3 Transaction, from the period of January 2003 through December 2006, UBS Real Estate securitized mortgage loans with an aggregate principal balance of approximately $91 billion; during the 2003, 2004, 2005 and 2006 fiscal years, UBS Real Estate securitized approximately $26.6 billion, $26.03 billion, $18.1 billion, and $20.2 billion of mortgage loans, respectively.

25.      The extent of the deficiencies in the mortgage loans securitizing RMBS transactions, which were covered up by firms, such as UBS Real Estate, that were amassing massive RMBS portfolios, has since been made public. On September 23, 2010, individuals from Clayton Holdings, a company that analyzed mortgage loan pools for many Wall Street firms, including UBS AG (UBS Real Estate's parent company, hereinafter "UBS"), testified before the Financial Crisis Inquiry Commission.[1] Clayton performed due diligence for clients on samples of loans being considered for purchase by sponsors of RMBS. This review considered, among other things, adherence to the originator's underwriting guidelines, compliance with

---

[1]      The Financial Crisis Inquiry Commission was created by the Fraud Enforcement and Recovery Act of 2009, and was established to examine the causes, domestic and global, of the current financial and economic crisis in the United States. In its work, the Financial Crisis Inquiry Commission is authorized to hold hearings; issue subpoenas either for witness testimony or documents; and refer to the Attorney General or the appropriate state Attorney General any person who may have violated domestic law in relation to the financial crisis.

federal, state, and local regulatory laws, and the integrity of electronic loan data provided by the seller.

26.     Clayton's results demonstrated that, between the first quarter of 2006 to the second quarter of 2007, 20 percent of the UBS mortgage loans (which, upon information and belief, included those for UBS Real Estate) that Clayton reviewed were rejected as falling outside the applicable underwriting guidelines. Of the mortgage loans that Clayton found defective, UBS waved 33 percent into securitizations, such as the Transactions here, without proper consideration and analysis of compensating factors. *See* Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report") at 167, available at http://fcic-static.law.stanford.edu/cdn_media/fcicreports/fcic_final_report_full.pdf.

27.     UBS and other Wall Street firms have become the focus of several investigations focused on their lax and faulty securitization practices. Presently, the Securities Exchange Commission is investigating whether UBS, among others, improperly sold collateralized debt obligations linked to the subprime mortgage loans that were at the center of the credit crisis. Further, the New York Attorney General issued subpoenas to five firms, including UBS, in connection with an investigation into whether the firms misled rating agencies about mortgage-backed securities in order to obtain higher ratings on the RMBS they issued.

28.     UBS has also been a focus of investigation by Swiss authorities. On December 24, 2007, Swiss regulators announced that the Swiss banking department charged with oversight of Swiss investment banks would be initiating a full investigation into how UBS Securities incurred massive losses in connection with the subprime markets in the United States, resulting in its taking a $10 billion write-down in its mortgage backed investments. In April 2008, UBS

10

presented Swiss banking regulators with a report in which UBS admitted that its losses in the
United States subprime mortgage market were due to a litany of errors, including inadequate risk
management and a focus on revenue growth.

    **C.**    **The Transactions at Issue in This Action**

    29.    The Transactions at issue involve securitizations of pools of first-lien, adjustable-
rate residential mortgage loans.

    30.    The 2006-OA2 Transaction closed on November 15, 2006. It consists of a pool of
prime and Alt-A adjustable rate, first lien mortgage loans. The mortgage loan pool consists of
four mortgage loan groups. Assured provided financial guaranty insurance on the Class 1-A-3,
2-A-3, and 4-A-2 Certificates, totaling $224 million in principal amount (the "Insured 2006-OA2
Certificates"), backed by three of those mortgage loan groups, totaling 5,306 mortgage loans at
closing.

    31.    The 2007-1 Transaction closed on January 16, 2007. It consists of a pool of
prime and Alt-A closed-end, adjustable-rate and hybrid-adjustable-rate, residential first-lien
mortgage loans. The mortgage loan pool consists of two mortgage loan groups. Assured
provided financial guaranty insurance on the Class 1-2A2 and 1-2A4 Certificates, totaling
$458,926,000 in principal amount (the "Insured 2007-1 Certificates"), backed by one of those
mortgage loan groups, totaling 4,589 mortgage loans at closing.

    32.    The 2007-3 Transaction closed on May 15, 2007. It consists of a pool of prime
and Alt-A closed-end, adjustable-rate residential first-lien mortgage loans. The pool consists of
four mortgage loan groups. Assured provided financial guaranty insurance on the Class 1-1A2,
1-2A2, 2-1A2, 2-2A3 and 2-2A6 Certificates, totaling $809,188,000 in principal amount (the
"Insured 2007-3 Certificates," and together with the Insured 2006-OA2 Certificates and the

Insured 2007-1 Certificates, the "Insured Certificates"), backed by two of these mortgage loan groups, totaling 6,478 mortgage loans at closing.

33.     For each of the Transactions, UBS Real Estate conveyed the pool of mortgage loans to MAST in exchange for cash. MAST in turn conveyed the pool of mortgage loans to the trust for the purpose of using the mortgage loans as collateral for the Certificates that would be sold to investors. The trust then worked with the underwriter, UBS Securities, to price and sell these Certificates. The trust issued the Certificates, and UBS Securities offered the Certificates for sale to investors. For each of the Transactions, Assured provided financial guaranty insurance for the benefit of the Insured Certificates.

34.     For each of the Transactions, the cash flows from the mortgage loans, in the form of payments of principal and interest, are used to pay obligations on the Certificates. The purchase of each Certificate is thus the purchase of a right to participate in the cash flows generated by the pool of underlying mortgage loans. Because the mortgage loans were the primary collateral supporting the Certificates, their credit quality was, and continues to be, of critical importance to Assured and the Certificateholders.

### D.     The Relevant Provisions of the Pooling and Servicing Agreements and Commitment Letters

35.     The Transactions were entered into pursuant to the basic process described above in Section A, with UBS Real Estate serving as the sponsor for each Transaction. Each Transaction included: (a) an Assignment, Assumption and Recognition Agreement that provided for the transfer of the mortgage loans by UBS Real Estate to its affiliated depositor, MAST; (b) a Pooling and Servicing Agreement that, among other things, transferred the mortgage loans to a single purpose trust, set forth UBS Real Estate's Mortgage Representations, established the rights of the Certificateholders and Assured, and set forth the obligations of the Transaction

12

trustee; (c) a commitment letter setting forth the terms pursuant to which Assured, in reliance on, inter alia, the Mortgage Representations set forth in the PSA, would agree to issue a financial guaranty insurance policy in relation to the Insured Certificates, subject to certain conditions precedent; and (d) a financial guaranty insurance policy covering certain payments on the Insured Certificates (the "Policy").

      36.    The PSAs governing the Transactions are as follows: (i) the PSA among MAST, UBS Real Estate, Wells Fargo Bank, N.A. ("Wells Fargo"), U.S. Bank National Association ("U.S. Bank"), and Clayton Fixed Income Services Inc. dated October 1, 2006, for the 2006-OA2 Transaction; (ii) the PSA among MAST, UBS Real Estate, Wells Fargo, and U.S. Bank, dated December 1, 2006, for the 2007-1 Transaction; and (iii) the PSA among MAST, UBS Real Estate, Wells Fargo, and U.S. Bank, dated April 1, 2007, for the 2007-3 Transaction.

      37.    In the PSAs, UBS Real Estate made the Mortgage Representations to Assured and the Transaction trustee, including representations concerning: (1) the key characteristics of the mortgage loans that backed the Certificates issued in the Transaction; and (2) adherence to the Underwriting Guidelines pursuant to which the mortgage loans were originated. UBS Real Estate was in a position to make the Mortgage Representations because, unlike Assured and the Certificateholders, it had access to the loan files and selected the mortgage loans for inclusion in the Transactions. UBS Real Estate – not Assured or the Certificateholders – thus bore the risk that its Mortgage Representations were untrue.

      38.    In the each of the PSAs, UBS Real Estate made the Mortgage Representations, including the following:

- **Accuracy of Mortgage Loan Schedule.** The "information set forth in the Mortgage Loan Schedule was true and correct in all material respects at the date or dates respecting which such information is furnished as specified in the Mortgage Loan Schedule." 2006-OA2 PSA Schedule II(i); 2007-1 PSA Schedule

13

II(i); 2007-3 PSA Schedule II(1). Items included on the Mortgage Loan Schedule include DTI ratio, intended occupancy, and LTV ratio.

- **Underwriting**. The Mortgage Loans were "underwritten in accordance with the underwriting guidelines" of the related loan originator "in effect at the time of origination with exceptions thereto exercised in a reasonable manner." 2006-OA2 PSA Schedule II(xxx); 2007-1 PSA Schedule II(xxx); 2007-3 PSA Schedule II(28).

- **Borrower Ability to Pay**: With respect to the Group I mortgage loans in the 2006-OA2 Transaction and the Subgroup I-I mortgage loans in the 2007-I Transaction, "the Mortgage Loan's originator made a reasonable determination that at the time of origination the borrower had the ability to make timely payments on the Mortgage Loan." 2006-OA2 PSA Schedule II(xlv); 2007-1 PSA Schedule II(xlvi).

39.     These Mortgage Representations were also reflected in materials that UBS Real Estate provided to Assured prior to the closing of each Transaction as further inducement for Assured to act as financial guaranty insurer for certain classes of Certificates.

40.     In Section 2.03 of each of the PSAs, UBS Real Estate represented that each of the Mortgage Representations in such PSA was true as of the date the Transaction to which it is related closed.

41.     Section 11.12 of each PSA provides that Assured "shall ... be deemed a third-party beneficiary of this Agreement to the same extent as if it were a party hereto, and shall have the right to enforce the provisions of this Agreement."

42.     As such, the PSAs for each Transaction entitle Assured to broad remedies for any breaches of the Mortgage Representations by UBS Real Estate. For example, under Section 2.03 of each of the PSAs, Assured may notify UBS Real Estate if it determines that any mortgage loan fails to conform to the Mortgage Representations in a manner that "materially and adversely affects the interests of the Certificateholders or the Certificate Insurer [Assured] in any Mortgage Loan." Under that same provision, within 90 days of such notice or of the Transferor's [UBS Real Estate's] knowledge of the breach (whichever is earlier), UBS Real Estate must cure the

14

breach, substitute a mortgage loan that conforms with the Mortgage Representations, or repurchase the defective mortgage loan. (UBS Real Estate had the second option only for the first two years after the Transaction closed.) UBS Real Estate must make such a substitution or repurchase "notwithstanding the Transferor's [UBS Real Estate's] lack of knowledge with respect to the substance of such representation or warranty," per Section 2.03 of each PSA.

43.    In addition, also under Section 2.03 of each of the PSAs, UBS Real Estate must "promptly reimburse" Assured "for any expenses reasonably incurred by" Assured "in respect of enforcing the remedies for such breach by" UBS Real Estate relating to its failure to comply with its obligations to cure the breach, repurchase the defective mortgage loan, or substitute a mortgage loan that conforms to the Mortgage Representations.

44.    In addition, for each Transaction, UBS Real Estate, MAST, and Assured entered into a commitment letter (collectively, the "Commitment Letters"), pursuant to which Assured issued a financial guaranty insurance policy (collectively, the "Policies") covering certain shortfalls in the scheduled payments of principal and interest and certain principal write-downs for the Insured Certificates.

45.    The Commitment Letters for the Transactions are as follows: (i) commitment letter among Assured, MAST, and UBS Real Estate, dated November 15, 2006, for the 2006-OA2 Transaction; (ii) commitment letter among Assured, MAST, and UBS Real Estate, dated January 16, 2007, for the 2007-1 Transaction; and (iii) commitment letter among Assured, MAST, and UBS Real Estate, dated May 15, 2007, for the 2007-3 Transaction.

46.    Each of the Commitment Letters requires, among other things, that Assured be provided with shadow credit ratings of AAA and Aaa on the Insured Certificates from Standard and Poor's Ratings Services ("Standard & Poor's") and Moody's Investors Service ("Moody's),

respectively, as a condition precedent to Assured issuing its Policy.  In order to procure these ratings, UBS Real Estate provided Standard & Poor's and Moody's with loan tapes, together with pool-level data derived from the loan-level information on the loan tapes, and information as to the Transactions' structures.  Based on the mortgage loan data UBS Real Estate provided to them, Standard & Poor's and Moody's issued the following shadow ratings, among others:

- A shadow rating of AAA for the Class 1-A-3, 2-A-3, and 4-A-2 Certificates issued by the 2006-OA2 Transaction by letter from Standard & Poor's dated November 15, 2006;

- A shadow rating of AAA for the Class 1-A-3, 2-A-3, and 4-A-2 Certificates issued by the 2006-OA2 Transaction by oral confirmation from Moody's;

- A shadow rating of AAA for the Class 1-2A2 and 1-2A4 Certificates issued by the 2007-1 Transaction by letter from Standard & Poor's dated January 16, 2007;

- A shadow rating of Aaa for the Class 1-2A2 and 1-2A4 Certificates issued by the 2007-1 Transaction by oral confirmation from Moody's;

- A shadow rating of Aaa for the Class 1-1A2, 1-2A2, 2-1A2, 2-2A3, and 2-2A6 Certificates issued by the 2007-3 Transaction by letter from Moody's on May 15, 2007; and

- A shadow rating of AAA for the Class 1-1A2, 1-2A2, 2-1A2, 2-2A3, and 2-2A6 certificates issued by the 2007-3 Transaction by letter from Standard & Poor's on May 15, 2007.

47.     As UBS Real Estate understood, Assured required these ratings, the highest awarded by the ratings agencies, because they should signify that the Transactions' collateral was robust enough for the Insured Certificates (without the benefit of Assured's Policies) to be exposed to de minimis risk of loss.

48.     The representations in the Commitment Letters were and are material to Assured, and were a condition precedent to Assured's agreement to issue its Policies.

E.     **Assured's Forensic Re-Underwriting Demonstrates Pervasive Breaches of the Mortgage Representations in the PSAs**

49.      There have been a staggering number of delinquencies among the mortgage loans underlying each Transaction. As of December 31, 2011, there was $950,909,899 in outstanding principal balance of the remaining mortgage loans collateralizing the Insured Certificates in the 2006-OA2 Transaction; of these remaining mortgage loans, $477,017,149—50 percent—have been delinquent for at least sixty days. As of December 31, 2011, there was $939,959,753 in outstanding principal balance of the remaining mortgage loans collateralizing the Insured Certificates in the 2007-1 Transaction; of these remaining mortgage loans, $322,329,634—34 percent—have been delinquent for at least sixty days. As of December 31, 2011, there was $1,207,353,591 in outstanding principal balance of the remaining mortgage loans collateralizing the Insured Certificates in the 2007-3 Transaction; of these remaining mortgage loans, $628,913,650—52 percent—have been delinquent for at least sixty days.

50.      In light of the unusually high delinquency and default rates, Assured performed a re-underwriting review of certain mortgage loans in each Transaction in order to determine whether they complied with the Mortgage Representations made by UBS Real Estate.

51.      The re-underwriting was performed using the same Underwriting Guidelines that, according to UBS Real Estate's Mortgage Representations, had been used by the loan originators to ensure the quality of the mortgage loans collateralizing the Transactions. Each loan file was analyzed to confirm the accuracy or completeness of legal documents, income, credit, and asset documentation, appraisal analysis, adherence to the underwriting guidelines, and the underwriting decision as a whole. The review examined the loan file for any "red flags" that should have been caught by the loan originator, such as evidence that stated income was unreasonable, that borrower employment, borrower income and/or occupancy was

17

misrepresented, or that debts were not fully disclosed. This forensic re-underwriting revealed that, as of the closing date of each of the Transactions, a significant number of the mortgage loans failed to comply with the Mortgage Representations in the PSAs.

52.     As of December 15, 2011, Assured had reviewed the loan files for 2,945 delinquent and liquidated loans, with an original principal balance of $1,173,390,439, in the Transactions. The following table provides a summary of the astounding number of breaches identified and confirmed through that review:

| Transaction | Number of Mortgage Loans Reviewed | Number of Mortgage Loans with Breaches of Mortgage Representations | Original Principal Value of Mortgage Loans with Breaches of Mortgage Representation | Breach Rate |
|---|---|---|---|---|
| 2006-OA2 | 187 | 167 | $61,295,315 | 90.47% |
| 2007-1 | 2,070 | 1,616 | $676,060,519 | 81.25% |
| 2007-3 | 688 | 657 | $260,486,801 | 95.20% |
| Totals | 2,945 | 2,440 | $997,842,635 | 85.04% |

53.     Assured provided written notice to UBS Real Estate of the specific breaches of the Mortgage Representations based on the results of the re-underwriting. These notices included detailed descriptions of each specific breach, such as unreasonableness of stated income, misrepresentations of income, employment, occupancy, and debt obligations; inaccurate and false loan-level information provided to Assured, Certificateholders, and the rating agencies; debt-to-income ratios that exceeded the limits set forth in the Underwriting Guidelines; loan-to-value ratios and combined loan-to-value ratios that exceeded the limits set forth in the Underwriting Guidelines; and relevant documents that are either defective or missing from the loan files.

54.     The results of this review demonstrate that UBS Real Estate repeatedly and pervasively breached the Mortgage Representations. Moreover, these breaches materially and

adversely affect the interests of the Certificateholders and Assured in the mortgage loans. The following categories illustrate the types of breaches of the Mortgage Representations that pervade the Transactions. Examples of each type follow in the Appendix, annexed hereto.

55.    The re-underwriting review revealed that, in each Transaction, loan originators pervasively breached the Underwriting Guidelines and, therefore, the Mortgage Representation guaranteeing adherence to the applicable Underwriting Guidelines. For example:

- **Unreasonable Stated Income.** The Underwriting Guidelines for reduced documentation loans required that a borrower's stated income be consistent with the borrower's occupation and credit and asset profile. But loan originators routinely failed to determine whether stated incomes were reasonable.

- **Use of Improper Loan Qualification Program.** According to the applicable Underwriting Guidelines, if a loan application under a reduced-documentation program displayed factual inconsistencies—for example, if a borrower made a statement that was contradicted by a document in the loan application—then the loan could be extended only if the borrower underwent a more stringent loan program application, one with more robust documentation requirements. But loan originators routinely processed loans under the reduced documentation loan programs despite numerous application inconsistencies.

- **Failure to Verify That Borrower's Assets Were Sufficient.** According to the applicable Underwriting Guidelines, the loan originators were generally required to obtain satisfactory verification of assets for each borrower in an amount generally equal to at least three to six months of the new housing payments, plus verification that the borrower had all the funds needed to close the subject transaction. But loan originators routinely failed to verify the borrowers' assets.

56.    The Mortgage Loan Schedule for each PSA contained, for each loan, among other things, (a) the DTI ratio; (b) the borrower's intended occupancy with respect to the mortgaged property; and (c) the LTV ratio. Assured's re-underwriting review has revealed that much of this information was false due to widespread falsification of borrowers' income and debt, inflated property values, intent to occupy, and other misrepresentations of key characteristics of the mortgage loans, all of which constitute breaches of the Mortgage Representation guaranteeing the accuracy of the information in the Mortgage Loan Schedule. For example:

19

- **False DTI Ratios.** A key measure of ability to repay a mortgage loan is the DTI ratio, or the borrower's monthly debt obligations compared to his or her monthly income. The higher the DTI ratio (*i.e.*, the greater the percentage of monthly income a borrower must devote to debt payments), the greater the risk of default. But the Mortgage Loan Schedules contained numerous understated DTI ratios.

- **False Occupancy Disclosures.** An accurate representation of the occupancy status (*i.e.*, whether the property securing a mortgage loan is to be the borrower's primary residence, a second home, or an investment property) is critical in assessing the risk that a borrower will not repay a mortgage loan and determines what guidelines apply to the underwriting of such mortgage loan. Borrowers who reside in mortgaged properties generally are less likely to default than borrowers who purchase properties as second homes or investment properties and live elsewhere, and borrowers generally are more likely to maintain the condition of their primary residence. But the Mortgage Loan Schedules contained numerous occupancy misrepresentations.

- **False LTV Ratios.** The LTV ratio reflects the percentage of a property's appraised value covered by the mortgage loan. The higher the LTV ratio, the greater the risk that, if the mortgaged property were liquidated, the resulting funds would be insufficient to repay the mortgage loan. But the Mortgage Loan Schedules contained numerous false LTV ratios.

57.   The aforementioned breaches of the Mortgage Representations materially and adversely affect the interests of the Certificateholders and Assured in the related mortgage loans. These breaches, which represent only a few of many in the mortgage loans collateralizing the Transactions, are severe and pervasive.

58.   The re-underwriting review also revealed that the shadow credit ratings obtained by UBS Real Estate for the Insured Certificates, which Assured also relied upon, did not accurately reflect the credit quality of the mortgage loans securing the Insured Certificates. UBS Real Estate obtained the requisite shadow ratings by providing to the rating agencies loan tapes and pool-level data (also provided to Assured) that the forensic re-underwriting review demonstrates were replete with false statistics relating to individual mortgage loans. As discussed, the DTI ratios for certain mortgage loans are materially false and misleading because the monthly income was falsely overstated and/or the monthly debt obligations were falsely

understated. Additionally, the LTV ratios for certain mortgage loans are materially false and misleading because, among other things, the value of the underlying property was falsely overstated. Finally, the representations in the Mortgage Loan Schedules as to the borrowers' intent to occupy the properties securing certain mortgage loans are materially false and misleading because, in fact, the properties were not occupied by the borrowers but instead were either speculative investments or secondary residences.

59. The rating agencies relied on the false information supplied by UBS Real Estate, including false data about key characteristics of the mortgage loans and the mortgage loan pools, and as a result issued falsely inflated shadow ratings. By supplying false information to Moody's and Standard & Poor's, UBS Real Estate ensured that Assured would be provided with falsely inflated shadow ratings that concealed the true risk associated with the mortgage loan pools in the Transactions.

**F.     UBS Real Estate's Refusal to Meet Its Repurchase Obligations**

60. Pursuant to Section 2.03 of each of the PSAs, Assured sent UBS Real Estate a series of written notices identifying defective mortgage loans in each Transaction and demanding that UBS Real Estate either cure the defects or repurchase those mortgage loans within 90 days of the notice. Specifically, Assured made the following requests to UBS Real Estate:

- By a letter dated August 9, 2010, Assured requested that UBS Real Estate cure or repurchase 270 defective mortgage loans in the 2007-1 Transaction with an original principal balance of $140,348,606.

- By a letter dated August 13, 2010, Assured requested that UBS Real Estate cure or repurchase 325 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $129,403,675.

- By a letter dated August 13, 2010, Assured requested that UBS Real Estate cure or repurchase 112 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $55,219,616.

21

- By letter dated August 13, 2010, Assured requested that UBS Real Estate cure or repurchase 55 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $19,644,848.

- By letter dated June 17, 2011, Assured requested that UBS Real Estate cure or repurchase 412 defective mortgage loans in the 2007-1 Transaction with an original principal balance of $184,153,505.

- By letter dated June 30, 2011, Assured requested that UBS Real Estate cure or repurchase 329 defective mortgage loans in the 2007-1 Transaction with an original principal balance of $164,780,597.

- By letter dated June 30, 2011, Assured requested that UBS Real Estate cure or repurchase 289 defective mortgage loans in the 2007-1 Transaction with an original principal balance of $72,081,142.

- By letter dated July 5, 2011, Assured requested that UBS Real Estate cure or repurchase 236 defective mortgage loans in the 2007-1 Transaction with an original principal balance of $83,524,093.

- By letter dated July 7, 2011, Assured requested that UBS Real Estate cure or repurchase 87 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $30,816,660.

(collectively, the "Breach Notices"). In total, as of December 15, 2011, Assured requested UBS

Real Estate cure or repurchase 2,115 mortgage loans with an original unpaid principal balance of

approximately $879,972,742, for which the cure period has expired, and UBS Real Estate has

failed to repurchase all but a small fraction of those defective mortgage loans.

61.     Assured subsequently issued further repurchase demands to UBS Real Estate, for

which the 90-day cure period has yet to expire. Specifically, Assured issued the following

additional repurchase demands to UBS Real Estate:

- By letter dated December 14, 2011, Assured requested that UBS Real Estate cure or repurchase 167 defective mortgage loans in the 2006-OA2 Transaction with an original principal balance of $61,295,315.

- By letter dated December 15, 2011, Assured requested that UBS Real Estate cure or repurchase 80 defective mortgage loans in the 2007-1 Transaction with an original principal balance of $31,172,576.

22

- By letter dated December 15, 2011, Assured requested that UBS Real Estate cure or repurchase 78 defective mortgage loans in the 2007-3 Transaction with an original principal balance of $25,402,002.

(collectively, the "Additional Breach Notices"). Thus, there are currently outstanding three Additional Breach Notices in which Assured has demanded that UBS Real Estate cure or repurchase an additional 325 mortgage loans with an original unpaid principal balance of approximately $117,869,893. Together, the Breach Notices and Additional Breach notices demanded that UBS Real Estate cure or repurchase a total of 2,440 mortgage loans with an original unpaid principal balance of approximately $997,842,635.

62.     In each Breach Notice and Additional Breach Notice, Assured detailed the violations of the Mortgage Representations that materially and adversely affect the interests of the Certificateholders and Assured in the related mortgage loans, in particular the Mortgage Representation that all mortgage loans were underwritten pursuant to the applicable Underwriting Guidelines, with all exceptions exercised on a reasonable basis, and the Mortgage Representation that the data in the Mortgage Loan Schedule was accurate. The Breach Notices and Additional Breach Notices are incorporated by reference into this Complaint.

63.     The 90-day cure period for the Breach Notices has expired, but UBS Real Estate has failed to repurchase or substitute all but a small percentage of the defective mortgage loans. Given UBS Real Estate's nearly across-the-board failure to comply with its obligations with respect to the defective mortgage loans identified by Assured in its Breach Notices, Assured reasonably anticipates that UBS Real Estate will likewise fail to comply with its obligations with respect to defective mortgage loans identified in the Additional Breach Notices and any additional breach notices Assured may make in the future.

23

### G.    Resulting Damage to Assured

64.    UBS Real Estate's pervasive breaches of the Mortgage Representations, through its inclusion of a massive number of defective mortgage loans in the Transactions, as well as its pervasive breaches of its repurchase obligations, go to the very core of the bargain between the parties. Assured relied on the Mortgage Representations and reasonably concluded that it was providing financial guaranty insurance to RMBS with robust underlying collateral and, thus, a minimal risk of default. Assured further relied on UBS Real Estate's commitment to cure any breaches of the Mortgage Representations or repurchase any defective loans as a guarantee that UBS Real Estate, and not Assured, would bear the risk that the mortgage loans were not as represented.

65.    Contrary to UBS Real Estate's Mortgage Representations, the Transactions were assembled from toxic mortgage loans, which present a materially greater risk of delinquency and default and have become delinquent and defaulted at much higher rates than they would have had they conformed to the Mortgage Representations. As a direct consequence of the breaches of the Mortgage Representations, Assured's risk of loss is far greater than would have been the case had the mortgage loans conformed to the Mortgage Representations. Furthermore, UBS Real Estate, contrary to its contractual commitment, has refused to cure or repurchase all but a small fraction of the defective mortgage loans that it included in the Transactions.

66.    In addition, Assured relied on the shadow credit ratings that UBS Real Estate secured through its provision of the faulty mortgage loan data to the rating agencies, and Assured would not have entered into the Transactions if those shadow ratings had accurately reflected the true risks associated with the defective mortgage loan collateral.

67.    As of January 31, 2012, Assured has paid approximately $308,200,701 in aggregate claims: approximately $129,576,296 in claims in the 2006-OA2 Transaction,

approximately $90,788,332 in claims in the 2007-1 Transaction, and approximately $87,836,072 in claims in the 2007-3 Transaction, far more than would have occurred had the mortgage loans collateralizing the Transactions complied with the Mortgage Representations. Assured is exposed to additional claims under each of the Policies because additional mortgage loans in each Transaction continue to become delinquent and eventually will be liquidated, which will lead to further shortfalls in the mortgage loan cash flows necessary for the related Trust to pay required principal and interest on the Insured Certificates, as well as to principal write-downs, for which Assured will have to pay claims under its Policies. To place Assured in the position it would have occupied absent UBS Real Estate's breaches of contract, UBS Real Estate must pay to Assured, at a very minimum: (i) all Policy claim payments Assured has made to date under each Transaction, (ii) the reasonable expenses Assured incurred in connection with its diligence into the defective mortgage loans in each Transaction, and (iii) all future claim payments Assured will have to make under each Policy.

## FIRST CAUSE OF ACTION
### (Breach of Mortgage Representations)

68.     Assured repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

69.     This is a claim for breach of contract against UBS Real Estate with respect to the Mortgage Representations set forth in the Pooling and Servicing Agreement for each Transaction.

70.     In each PSA, UBS Real Estate made extensive Mortgage Representations concerning the mortgage loans collateralizing the Transaction.

71.     UBS Real Estate's Mortgage Representations in each Transaction were material to Assured's decision to issue the related Policy. UBS Real Estate's compliance with the

25

Mortgage Representations in each Transaction was and is necessary for Assured to obtain the benefit of its bargain.

72.     The Mortgage Representations in each Transaction were false.  For example, the DTI ratios for numerous mortgage loans in each Transaction were miscalculated based on overstated borrower incomes or understated borrower debts.  UBS Real Estate also represented and warranted that the mortgage loans in each Transaction were underwritten in accordance with the applicable Underwriting Guidelines when, in fact, they were not.

73.     Assured is an express third party beneficiary of each PSA.

74.     Had Assured known that UBS Real Estate had furnished false and misleading information for inclusion in the PSAs, or had contributed mortgage loans to each Transaction that had not been originated in compliance with the Underwriting Guidelines, Assured would not have issued any of the Policies.

75.     Assured has fully complied with its obligations under each Policy.

76.     As a direct result of UBS Real Estate's breaches of the Mortgage Representations in each Transaction, Assured has incurred and will continue to incur damages.

77.     Assured is entitled to rescissory damages based on UBS Real Estate 's untrue and inaccurate Mortgage Representations in each Transaction.

78.     In the alternative, Assured is entitled to damages, including without limitation interest and reasonable attorneys' and accountants' fees and expenses, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Repurchase Obligations)

79.     Assured repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

80.     This is a claim for breach of contract against UBS Real Estate with respect to its repurchase obligations under each PSA.

81.     In Section 2.03 of each PSA, UBS Real Estate covenanted that, within 90 days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty which materially and adversely affected the interests of the Certificateholders or Assured in any mortgage loans, it would cure such breach or repurchase the affected mortgage loan or mortgage loans from the trust at the purchase price set forth in the PSA.

82.     In the Breach Notices for each Transaction, Assured provided UBS Real Estate with notice of breaches of Mortgage Representations that materially and adversely affected the interests of the Certificateholders and Assured in the mortgage loans underlying each Transaction.  The Breach Notices identified the specific mortgage loans that contained one or more breaches of the Mortgage Representations and described in detail the nature and type of those breaches.

83.     The 90-day period in which UBS Real Estate was required to cure the breaches identified in the Breach Notices, or repurchase the defective mortgage loans identified therein, has expired.  UBS Real Estate has materially breached the PSAs by failing to repurchase the vast majority of those defective mortgage loans.

84.     Assured has fully complied with its obligations under each Policy.

85.     As a direct result of UBS Real Estate's breaches of its repurchase obligations, Assured has incurred and will continue to incur damages, including without limitation interest and reasonable attorneys' and accountants' fees and expenses, in an amount to be determined at trial.

27

### THIRD CAUSE OF ACTION
#### (Breach of the Commitment Letters)

86.    Assured repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

87.    This is a claim for breach of contract against UBS Real Estate with respect to its obligations in the Commitment Letters.

88.    Each Commitment Letter provides that it shall be a condition precedent to the issuance of the related Policy by Assured that Assured shall have received confirmation from Standard & Poor's and Moody's that the Insured Certificates would have been rated AAA and Aaa respectively, without regard to the issuance of the Policy.

89.    This condition was material to Assured's decision to issue each Policy.  UBS Real Estate's compliance with this condition was and is necessary for Assured to obtain the benefit of its bargain.

90.    UBS Real Estate has materially breached each Commitment Letter by procuring falsely inflated shadow ratings.  UBS Real Estate procured falsely inflated shadow ratings by conveying to Standard & Poor's and Moody's false and misleading data and information concerning the mortgage loans in the related Transaction.

91.    This breach strikes at the heart of each Commitment Letter and Policy.  Had Assured known that UBS Real Estate had caused false and misleading shadow ratings to be given to Assured, and that those ratings were inflated as a result of the false information provided by UBS Real Estate to the rating agencies, Assured would not have issued the Policies.

92.    Assured has fully complied with its obligations under the Commitment Letters and Policies.

93.     Assured is entitled to rescissory damages based on UBS Real Estate's untrue and inaccurate representations and warranties.

94.     In the alternative, Assured is entitled to damages, including without limitation interest and reasonable attorneys' and accountants' fees and expenses, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Declaratory Judgment)

95.     Assured repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

96.     This is a claim for declaratory judgment against UBS Real Estate with respect to its continuing failure to fulfill its contractual obligation to cure the pervasive breaches of the Mortgage Representations in each Transaction.

97.     In Section 2.03 of each PSA, UBS Real Estate covenanted that, within 90 days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty which materially and adversely affected the interests of the Certificateholders or Assured in any mortgage loans, it would cure such breach or repurchase the affected mortgage loan or mortgage loans from the trust at the purchase price set forth in the PSA.

98.     Pursuant to its rights under each PSA, Assured provided UBS Real Estate, in nine separate letters, notice of specified breaches with respect to numerous mortgage loans collateralizing each of the Transactions. In those nine letters, Assured provided notice to UBS Real Estate to cure or repurchase 2,115 mortgage loans with an original unpaid principal balance of approximately $879,972,742. In addition to the aforementioned nine letters, Assured has sent an additional three notices in which it has identified 325 additional defective mortgage loans

29

with an original unpaid principal balance of $117,869,893 for which the 90-day period has not yet expired.

99.    Of the mortgage loans investigated as of December 15, 2011, breaches of the Mortgage Representations in the 2006-OA2 Transaction have been identified in approximately 90 percent of the mortgage loans, in the 2007-1 Transaction in approximately 81 percent of the mortgage loans, and in the 2007-3 Transaction in approximately 95 percent of the mortgage loans.  Because of these rampant breaches detected among those mortgage loans that have thus far been reviewed in each of the Transactions, Assured reasonably anticipates that it will identify and provide notice to UBS Real Estate of breaches in additional mortgage loans in each of the Transactions, and that UBS Real Estate, consistent with its established practice as confirmed by its failure to fulfill its obligations with respect to those mortgage loans identified in the Breach Notices presented thus far, will continue to fail to meet its 90-day cure-or-repurchase obligation.

100.    Because UBS Real Estate has refused to honor the Breach Notices and has refused to satisfy and/or acknowledge its obligations to repurchase defective mortgage loans pursuant to the terms of the PSAs, there exists a real and justiciable controversy as to the rights and legal relations under the PSAs.  Assured therefore seeks a declaration that UBS Real Estate must honor its PSA cure-or-repurchase obligations within the prescribed 90-day period with respect to all defective mortgage loans in the Transactions for which Assured provides notice.

### FIFTH CAUSE OF ACTION
**(Declaratory Judgment)**

101.    Assured repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

102.    Each Commitment Letter provides that it shall be a condition precedent to the issuance of the Policy that Assured shall have received confirmation from Standard & Poor's and

30

Moody's that the Insured Certificates would have been rated AAA and Aaa respectively, without regard to the issuance of the Policy.

103.    This condition was material to Assured's decision to issue the Policies. UBS Real Estate's compliance with this condition was and is necessary for Assured to obtain the benefit of its bargain.

104.    UBS Real Estate has materially breached each Commitment Letter by procuring falsely inflated shadow ratings. UBS Real Estate procured falsely inflated shadow ratings by conveying to Standard & Poor's and Moody's false and misleading data and information concerning the mortgage loans in each Transaction.

105.    This breach strikes at the heart of the Commitment Letters and the Policies. Had Assured known that UBS Real Estate had caused false and misleading shadow ratings to be given to Assured, and that those ratings were inflated as a result of the false information provided by UBS Real Estate to the rating agencies, Assured would not have issued any of the Policies.

106.    Assured has fully complied with its obligations under each Commitment Letter and Policy.

107.    Because UBS Real Estate has materially breached each Commitment Letter, there exists a real and justiciable controversy as to the rights and legal relations of the parties under those agreements. Assured therefore seeks a declaratory judgment that UBS Real Estate is required to reimburse Assured: (1) to the full extent of its exposure under each Policy, and (2) for any and all payments made as a result of UBS Real Estate's breaches of the Commitment Letters.

## PRAYER FOR RELIEF

WHEREFORE ASSURED prays for relief as follows:

      a.    For an award of damages against Defendant, in an amount to be proven at trial, but including at a minimum:

      i.    Assured's payments on current and future claims under each Policy;

      ii.    Assured's compensatory and consequential losses, including lost profits and business opportunities;

      iii.    Assured's attorneys' fees, costs, and expenses associated with enforcing its legal rights under each PSA; and

      iv.    Pre-judgment interest at the maximum legal rate.

      b.    For a declaratory judgment that UBS Real Estate must honor its cure-or-repurchase obligations within the prescribed 90-day period with respect to all defective mortgage loans in the Transactions for which Assured provides notice;

      c.    For a declaratory judgment that UBS Real Estate is required to reimburse Assured: (1) to the full extent of Assured's exposure under each Policy, and (2) for any and all payments made as a result of UBS Real Estate's breaches of each Commitment Letter; and

      d.    Such other and further relief as the Court may deem just and proper.

DATED:  New York, New York
        February 2, 2012

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _____
    Philippe Z. Selendy
    Adam M. Abensohn
    Nicholas F. Joseph

    51 Madison Avenue, 22nd Floor
    New York, New York  10010-1601
    (212) 849 7000

    *Attorneys for Assured Guaranty Municipal
    Corp. f/k/a Financial Security Assurance
    Inc.*

**Appendix**

| Breach | Loan Amount | Transaction | Description |
|---|---|---|---|
| Unreasonable Stated Income | $244,000 | 2006-OA2 | The borrower stated a monthly income of $7,400 as a business manager for a department store and $4,300 per month from employment as an office manager for a doctor. The lender should have questioned the borrower's claim to have what appeared to be two full-time jobs. The co-borrower stated income of $6,600 per month as a medical coordinator for an insurance company and $2,800 per month as an instructor for a school. Moreover, in the initial loan application, the borrower stated income from secondary employment of $2,300 per month, which was later marked through and increased to $4,300 per month. The borrowers' asset and credit profiles did not support their stated earnings. The borrowers stated liquid assets of $29,940, which would be less than two months' stated income, and was not indicative of individuals with $253,200 annual income. The credit report reflected that the borrowers had revolving debt of $42,500, indicating that the borrowers were obligated on revolving debts that were twice their stated monthly incomes. Given these facts relating to the borrowers' employment, assets, and credit, it was not reasonable for the lender to approve the mortgage loan using the stated income. |
| Unreasonable Stated Income | $187,500 | 2007-1 | The borrower claimed income of $174,996 per year as a field supervisor for local government, and the co-borrower claimed income of $95,000 per year as a teller for a credit union. The lender failed to question whether the borrowers' incomes were reasonable in light of their employment and credit profiles. According to the local government's salary chart, which was publicly available at the time, a field supervisor can earn a maximum of $37,776 per year, which is barely one-fourth of the salary the borrower claimed. According to Salary.com, a head teller in the borrowers' city can make $36,036 per year, which is barely one-third of the salary the co-borrower claimed. Moreover, the borrowers' credit profiles did not support the income stated. The borrowers had a total of $84,514 in revolving credit card debt and had used at least 86 percent of the available credit on six credit cards. This excess use of credit is not representative of the credit profile of borrowers who earn nearly $270,000 per year. Given these facts relating to the borrowers' income and credit, it was not reasonable for the lender to approve the mortgage loan using the stated income. |

34

| Breach | Loan Amount | Transaction | Description |
|---|---|---|---|
| Unreasonable Stated Income | $650,000 | 2007-1 | The borrower claimed income of $114,000 per year as a medical consultant for a law office and $75,000 per year as a registered nurse for a regional hospital. The lender failed to question whether the borrower's income was reasonable in light of her employment (for each job individually and both jobs collectively), credit profile and asset profile. The loan file did not contain a verification of employment for either job, as required by the Underwriting Guidelines, and the underwriter should have questioned the borrower's claim to have what appeared to have been two full-time jobs. A letter dated October 19, 2010 from the law office at which the borrower claimed to work stated that the borrower never worked there. Additionally, the borrower's credit and asset profiles did not support her stated income. The borrower had over $96,000 in revolving credit card debt on over six credit cards. Furthermore, the borrower's checking account statements showed beginning and ending balances of $1,190 and $2,935 respectively. The revolving debt and checking account balances were not representative of a person earning nearly $190,000 per year. Given these facts relating to the borrower's income, assets, and credit, it was not reasonable for the lender to approve the mortgage loan using the stated income. |
| Use of Improper Loan Qualification Program | $213,500 | 2007-3 | The borrower's initial loan application stated that the borrower owned four properties. However, the borrower's credit report in the loan file indicated that borrower owned an undisclosed fifth property. The borrower's final loan application stated that borrower only owned two properties. In addition to these discrepancies, the loan file contains multiple inconsistencies with respect to the borrower's income and employment. In the borrower's loan application, the borrower first claimed salaried and commission income from three employers, but later claimed a different salaried and commission income from two employers. Moreover, the borrower's credit report indicated that he had only one employer. The lender did not question these discrepancies, and the loan closed as a reduced documentation loan. |
| Use of Improper Loan Qualification Program | $280,000 | 2007-3 | The borrower claimed income of $90,000 per year on his initial loan application dated February 1, 2007. However, less than ten days later, the borrower claimed additional income of $59,940 per year on an updated loan application. The lender did not question these discrepancies, and the loan closed as a reduced documentation loan. |

| Breach | Loan Amount | Transaction | Description |
|---|---|---|---|
| Failure to Verify That Borrower's Assets Were Sufficient | $133,730 | 2007-1 | Underwriting Guidelines required the lender to obtain verification of a minimum of $22,924.18 in assets for the borrower to qualify for the loan. However, the loan file contained only $808.58 in verified assets, and therefore did not meet the minimum requirement in the Underwriting Guidelines. |
| Failure to Verify That Borrower's Assets Were Sufficient | $800,000 | 2007-1 | Underwriting Guidelines required the lender to obtain verification of a minimum of $111,204.56 in assets for the borrower to qualify for the loan. However, the loan file did not contain any verification of assets. |
| False DTI Ratio | $420,000 | 2006-OA2 | The borrower claimed that she was employed as a Men's Department Manager in a department store, with a stated income of $8,650 per month. The Work Number revealed that the borrower's employment ended three months prior to the closing of the subject loan. Considering that the borrower was unemployed at the time of the subject loan, the qualifying income would have been $0. If the borrower were assumed to have $100 in monthly income instead of $0, that would result in a DTI ratio of 3,487.87 percent, which is many times greater than what was represented in the Mortgage Loan Schedule, and grossly exceeds the maximum DTI ratio of 38 percent allowed by the Underwriting Guidelines. |
| False DTI Ratio | $217,200 | 2007-1 | The borrower failed to disclose all of his owned real estate and all of his mortgages in his loan application. A Fraudguard report (a website that provides access to public record information relating to the borrower, including real estate owned) subsequently obtained by Assured revealed that the borrower failed to disclose two other mortgage loans in the borrower's name as of the date of the subject transaction. Factoring in the undisclosed mortgage payments, the loan's DTI ratio was 191.51 percent, which is more than several times greater than what was represented in the Mortgage Loan Schedule, and grossly exceeds the maximum DTI ratio of 45 percent in the Underwriting Guidelines. |
| False DTI Ratio | $272,000 | 2007-1 | The borrower failed to disclose all of his owned real estate and all of his mortgages in his loan application. A Fraudguard report subsequently obtained by Assured revealed that the borrower failed to disclose one other mortgage loan in the borrower's name as |

| Breach | Loan Amount | Transaction | Description |
|---|---|---|---|
| | | | of the date of the subject transaction. Furthermore, the borrower's loan application misrepresented his income. Factoring in the undisclosed mortgage payments and the borrower's actual income, the loan's DTI ratio was 169.34 percent, which is several times greater than what was represented in the Mortgage Loan Schedule, and grossly exceed the maximum DTI ratio of 45 percent in the Underwriting Guidelines. |
| False DTI Ratio | $147,512 | 2007-1 | The borrower failed to disclose all of her owned real estate and all of her mortgages in her loan application. A Fraudguard report subsequently obtained by Assured revealed that the borrower failed to disclose an additional mortgage loan that was in the borrower's name as of the date of the subject transaction. Furthermore, the borrower's loan application misrepresented her income. Factoring in the undisclosed mortgage payments and the borrower's actual income, the loan's DTI ratio was 149.28 percent, which is several times greater than what was represented in the Mortgage Loan Schedule, and grossly exceeds the maximum DTI ratio of 45 percent in the Underwriting Guidelines. |
| False Occupancy Disclosure | $200,700 | 2006-OA2 | The loan was submitted and approved as an owner-occupied transaction. However, a quality control review completed on November 3, 2009 by the private mortgage insurance company revealed that the borrower had informed the original loan officer at the time of application that she was purchasing the home as an investment. In particular, the borrower indicated she was purchasing the property as a "straw buyer." Thus, the information in the Mortgage Loan Schedule stating that the subject property was owner-occupied was not correct. |
| False Occupancy Disclosure | $540,000 | 2007-1 | The borrowers refinanced their home on September 28, 2006. In their loan application, the borrowers represented the home as their primary residence, and the Mortgage Loan Schedule stated that the property was owner-occupied. However, a Fraudguard report obtained by Assured revealed that the borrowers occupied another property from September 21, 2000 until December 24, 2009. Furthermore, a 411.com (a publicly available data base of telephone number listings) search did not list the borrowers as residing at the property. Finally, the appraisal associated with the subject transaction contains pictures showing that the subject property was vacant at the time of the refinancing. Thus, the information in the Mortgage Loan Schedule stating that the subject property was owner-occupied was not correct. |

37

| Breach | Loan Amount | Transaction | Description |
|---|---|---|---|
| False Occupancy Disclosure | $1,320,000 | 2007-1 | The subject loan closed on September 7, 2006. The borrower indicated that he occupied the property as his primary residence, and the Mortgage Loan Schedule stated that the property was owner-occupied. However, a Fraudguard report subsequently obtained by Assured revealed that the borrower's primary residence was in another state from November 10, 2005 until February 25, 2008. Thus, the information in the Mortgage Loan Schedule stating that the subject property was owner-occupied was not correct. |
| False Occupancy Disclosure | $356,000 | 2007-3 | The borrower represented in his mortgage loan application that the subject property was his primary residence, and the Mortgage Loan Schedule stated that the property was owner-occupied. However, the appraisal for the subject property indicated that it was vacant. Additionally, the verification of mortgage sent from the broker to the mortgage company indicated that the borrower resided in a different city. Thus, the information in the Mortgage Loan Schedule stating that subject property was owner-occupied was not correct. |
| False LTV Ratio | $285,000 | 2007-1 | The borrower had purchased the property only four months prior to the date of the loan for $260,000. If the appraised value of a property is higher than a recent sales price, the Underwriting Guidelines dictate that the increase in value must be reasonable. The appraisal contains no explanation supporting the rapid increase in the subject property's value. The LTV ratio using the very recent sales price of the subject property was 109.62 percent, which is substantially higher than the LTV ratio stated in the Mortgage Loan Schedule, and grossly exceeds the maximum LTV ratio of 80 percent in the Underwriting Guidelines. |
| False LTV Ratio | $2,990,000 | 2007-1 | To determine the subject property's value, the appraiser used properties that did not reflect the subject property's location, age, size, design and appeal, inflating the subject property's appraised value and lowering the subject transaction's LTV ratio. Using an appraised value of the subject property derived from transactions that were more representative of the subject property results in a LTV ratio of 92.41 percent, which is substantially higher than the LTV ratio stated in the Mortgage Loan Schedule, and grossly exceeds the maximum LTV ratio of 80 percent in the Underwriting Guidelines. |

38