UNITED STATES DISTRICT COURT                    **(ECF)**
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
ASSURED GUARANTY MUNICIPAL CORP.,  : 12 Civ. 1579 (HB) (JCF)
F/K/A FINANCIAL SECURITY           :
ASSURANCE, INC.,                   :
                                   :
            Plaintiff,             :
                                   :
    - against -                    :
                                   :
UBS REAL ESTATE SECURITIES INC.,   :
                                   :
            Defendant.             :
- - - - - - - - - - - - - - - - - - -:
MASTR ADJUSTABLE RATE MORTGAGES    : 12 Civ. 7322 (HB) (JCF)
TRUST 2006-OA2, MASTR ADJUSTABLE   :
RATE MORTGAGES TRUST 2007-1, MASTR : MEMORANDUM
ADJUSTABLE RATE MORTGAGES TRUST    : AND ORDER
2007-3,                            :
                                   :
            Plaintiffs,            :
                                   :
    - against -                    :
                                   :
UBS REAL ESTATE SECURITIES INC.,   :
                                   :
            Defendant.             :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

     This case arises out of agreements under which Assured
Guaranty Municipal Corp. ("Assured"), a bond insurer formerly known
as Financial Security Assurance Inc. ("FSA"), wrote financial
guaranty policies on three residential mortgage-backed securities
("RMBS") sponsored by UBS Real Estate Securities Inc. ("UBS").
Assured alleges that UBS breached contractual representations and
warranties as to the credit quality of the mortgage loans

1

underlying the agreements and that it breached its obligations under several commitment letters by providing rating agencies with false information in order to obtain inflated ratings for the insured certificates.

Both parties now move to compel certain discovery from the other.

Background

The factual background of this case is set forth in detail in the decision of the Honorable Harold Baer, U.S.D.J., addressing UBS's motion to dismiss the Complaint, Assured Guaranty Municipal Corp. v. UBS Real Estate Securities, Inc., No. 12 Civ. 1579, 2012 WL 3525613 (S.D.N.Y. Aug. 15, 2012), and in my memorandum and order of November 21, 2012 (the "November 21 Order") regarding the parties' discovery disputes, Assured Guaranty Municipal Corp. v. UBS Real Estate Securities, Inc., No. 12 Civ. 1579, 2012 WL 5927379 (S.D.N.Y. Nov. 21, 2012). Accordingly, I will repeat it here only as necessary to address the pending discovery motions.

A.    Transactions and Repurchase Demands

In April 2010, the Chief Executive Officer of Assured, Dominic Frederico, met with a UBS employee and discussed losses that Assured had allegedly incurred on financial guaranty policies for three RMBS transactions (the "Transactions") sponsored by UBS. (Declaration of William Chandler dated Feb. 5, 2013 ("Chandler

2

Decl."), ¶ 3). In a subsequent meeting attended by counsel from both sides, Bruce Stern of Assured allegedly threatened litigation against UBS if the disputed losses were not resolved to Assured's satisfaction. (Chandler Decl., ¶ 4). Beginning in August 2010, Assured sent repurchase demands to UBS alleging breaches of representations and warranties in the Pooling and Servicing Agreements ("PSAs"). (Declaration of John Lantz dated Feb. 5, 2013 ("Lantz Decl."), ¶ 9). UBS alleges that the size and scope of these demands were unprecedented for UBS. (Lantz Decl., ¶ 9).

UBS retained the law firm of Williams & Connolly in response to Assured's repurchase demands and alleged threats of litigation. (Declaration of Richard Hackney Wiegman dated Feb. 4, 2013 ("Wiegmann Decl."), ¶ 5). UBS asserts that Williams & Connolly assessed potential litigation exposure and oversaw the analyses of Assured's demands. (Lantz Decl., ¶ 10; Wiegmann Decl., ¶ 5). To assist Williams & Connolly, UBS created an internal working group, the Repurchase Custodians, to work under the law firm's direction. (Lantz Decl., ¶¶ 10-11; Wiegmann Decl., ¶ 6). Williams & Connolly also hired outside consultants to review documents and data. (Wiegmann Decl., ¶¶ 8-9).

   B.  November 21 Opinion

   On November 21, 2012, I granted in part and denied in part motions to compel filed by each party. Assured, 2012 WL 5927379.

3

UBS was ordered to produce relevant documents generated up to February 2, 2012 -- the date of the filing of the Complaint in this action -- because "[d]ocuments that post-date the transactions may nevertheless relate back to the state of affairs as it existed at the [time of the Transactions]." Id. at 2. Assured was ordered to produce documents relating to UBS's equitable defenses, including documents relating to Assured's knowledge of the originators' underwriting policies and the rating agencies' rating practices. Id. at *3-4. I rejected UBS's motion to compel documents concerning Assured's knowledge of the overall market conditions of RMBS as too tenuously related to its equitable defense. Id. at *4. I also noted that these determinations were "designed to provide guidance and not to bless the sweeping document requests that the parties have promulgated." Id. at *4.

Discussion

    A.   Discovery Sought by UBS

UBS seeks three categories of information: (1) documents from members of FSA's Credit Committee that approved the Transactions; (2) documents from members of the Workout Committee that monitored the Transactions; and (3) documents concerning the originators for the Transactions through the date of the filing of the Complaint.

    1.   Credit Committee

The Credit Committee at FSA, Assured's predecessor, was

responsible for approving FSA's international and structured finance transactions. Assured has identified as custodians, whose documents it is willing to produce, all non-lawyer members of the Credit Committee at the time of the Transactions (M. Douglas Watson, Russell Brewer, Geoff Durno, Thomas McCormick) except for Robert Cochran, FSA's Chairman and Chief Executive Officer, and Sean McCarthy, FSA's Chief Operating Officer.   UBS asks that Assured be required to search the files of Mr. Cochran and Mr. McCarthy for responsive documents.   (UBS Real Estate Securities Inc.'s Memorandum of Law in Support of Its Motion to Compel Discovery and Motion for a Protective Order ("UBS Memo.") at 8-10).

Assured does not dispute that Mr. Cochran and Mr. McCarthy are likely to possess responsive documents.   Rather, it resists discovery on the grounds that the discovery sought is disproportionate or duplicative under Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure.   (Plaintiff's Memorandum of Law in Support of Its Motion to Compel and in Opposition to Defendant's Motion to Compel ("Assured Memo.") at 15-18).   That rule provides:

> On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
>
> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C). "The 'metrics' set forth in Rule 26(b)(2)(C)(iii) provide courts significant flexibility and discretion to assess the circumstances of the case and limit discovery accordingly to ensure that the scope and duration of discovery is reasonably proportional to the value of the requested information, the needs of the case, and the parties' resources." The Sedona Conference, The Sedona Conference Commentary on Proportionality in Electronic Discovery, 11 Sedona Conf. J. 289, 294 (2010); accord Chen-Oster v. Goldman, Sachs & Co., 285 F.R.D. 294, 303 (S.D.N.Y. 2012); Tamburo v. Dworkin, No. 04 C 3317, 2010 WL 4867346, at *3 (N.D. Ill. Nov. 17, 2010).

Here, Assured contends that Mr. Cochran and Mr. McCarthy are unlikely to possess any non-duplicative documents. (Assured Memo. at 15). It asserts that it selected individuals most likely to have relevant documents, based on their roles and connections to the Transactions. (Assured Memo. at 16). This includes the Committee's Chairman, Mr. Watson, who reviewed all RMBS

transactions before they were brought to the Committee, assembled materials for approval of the Transactions, and set the agenda for the Committee's meetings. (Assured Memo. at 16; Declaration of M. Douglas Watson, Jr. dated Feb. 17, 2013 ("Watson Decl."), ¶¶ 3-4). Assured asserts that "[i]f Mr. Watson does not have a document pertaining to the Committee's consideration of a Transaction, it likely doesn't exist." (Plaintiff's Further Memorandum of Law in Support of Its Motion to Compel and in Opposition to Defendant's Motion to Compel and Motion for a Protective Order ("Assured Resp.") at 12).

UBS dismisses Assured's assertion as an "unsworn conclusion," "'insufficient to exclude discovery of requested information.'" (UBS Real Estate Securities Inc.'s Reply Memorandum of Law in Further Support of Its Motion to Compel and for a Protective Order and in Opposition to Assured's Motion to Compel ("UBS Resp.") at 12 (quoting Assured, 2012 WL 5927379, at *2)). While acknowledging that there may be some duplication, UBS contends that Assured's "handpicked 'representative members' will [not] possess all of the relevant documents." (UBS Resp. at 12-13, citing Mount Hawley Insurance Co. v. Felman Production, Inc., 269 F.R.D. 609, 620 (S.D.W.V. 2010) (granting motion to compel additional custodians even though it was "highly likely that the [requested custodians] will produce . . . duplicates of previously produced materials,"

because "it is reasonable to believe that they will have additional, highly relevant materials . . . which were not shared with [existing custodians]")).

However, unlike in Mount Hawley, UBS has not demonstrated why Mr. Cochran and Mr. McCarthy would be likely to have non-cumulative relevant documents. In Mount Hawley, the party seeking discovery submitted "extensive exhibits" to establish that the proposed custodians possessed additional relevant documents. 269 F.R.D. at 617. In contrast, UBS simply speculates that the positions of Mr. Cochran and Mr. McCarthy as senior executives "increase[] the relevance of their files" because "they are potentially the most important persons concerning Assured's knowledge at the time." (UBS Memo. at 9) (emphasis in original). While no special exemptions from discovery exist for senior executives who possess relevant information, see Haber v. ASN 50th Street, LLC, 272 F.R.D. 377, 382 (S.D.N.Y. 2011) (there is "no blanket prohibition on taking discovery from high-level executives," even where official denies personal knowledge), mere membership on a particular committee is not sufficient, by itself, to justify designation as a custodian whose files must be reviewed,[1] see

---

[1] Indeed, UBS's selection of its own custodians demonstrates this point: by its own account, UBS has named as custodians eight out of 28 members of its Mortgage Credit Committee and four out of 14 members of its Seller-Servicer Informal Working Group. (Letter

<u>United States ex rel. McBride v. Halliburton Co.</u>, 272 F.R.D. 235, 240-41 (D.D.C. 2011) (noting that court is obligated to consider, among other things, whether "the discovery sought is unreasonably cumulative or duplicative" and denying motion to add custodians where plaintiff, among other things, did not demonstrate that e-mails that had yet to be produced were crucial to her proof); <u>see also</u> <u>Eisai Inc. v. Sanofi-Aventis U.S., LLC</u>, Civ. A. No. 08-4168, 2012 WL 1299379, at *9 (D.N.J. April 16, 2012) (denying motion to compel discovery from additional custodians and accepting defendants' rationale for selection of its custodians -- to respond fully to plaintiff's document requests and produce responsive, non-duplicative documents).

There is no good reason here to believe that these two members of the Credit Committee had custody of relevant documents that other non-lawyer custodians did not possess. Therefore, UBS's motion to designate Mr. Cochran and Mr. McCarthy as custodians whose files must be searched is denied. <u>See</u> <u>Treppel v. Biovail Corp.</u>, 249 F.R.D. 111, 117 (S.D.N.Y. 2008) (denying motion to

---

of Paul J. Lockwood dated Jan 14, 2013, attached as Exh. F to Declaration of Adam M. Abensohn dated Feb. 5, 2013 ("Absensohn Decl. I"); E-mails dated Jan. 16, 2013, attached as Exh. G to Abensohn Decl. I; E-mails dated Dec. 12, 2012 and Dec. 17, 2012, attached as Exh. I to Abensohn Decl. I); <u>cf.</u> <u>Mount Hawley</u>, 269 F.R.D. at 617 (excluding member of group not involved in incident at issue).

compel absent showing that discovery requested will produce non-duplicative information).

     2.  <u>Workout Committee</u>

The Workout Committee, which formed in 2009 and meets roughly six times a year, develops and hears reports on loss mitigation and remediation strategies for troubled transactions. (Declaration of Bruce Stern dated Feb. 19, 2013 ("Stern Decl."), ¶¶ 3-4). Assured has identified as custodians of responsive documents Bruce Stern and Russell Brewer, the current and former Chairmen, respectively, of the Workout Committee, and Mr. Brewer's deputy, Richard Bauerfeld. It is the Chairman's role to organize the Committee's meetings, set the agenda, and distribute all documents to be discussed at the meetings. (Stern Decl., ¶ 3). Therefore, Assured asserts, they are likely to have all relevant documents from the Committee. (Assured Resp. at 13). It objects to reviewing files of the other members of the Committee on the same basis as it does regarding the members of the Credit Committee. (Assured Resp. at 13-15).

UBS seeks to require review of the files of all other non-lawyer members from this Committee: Howard Albert, Chief Risk Officer of Assured; Dominic Frederico, Chief Executive Officer of Assured; Robert Mills, Chief Operations Officer of Assured; Robert Bailenson, Chief Financial Officer of Assured; Gregory Rabb, Senior

Managing Director; Michael Schozer, President of Assured; and Michael DiRende.   UBS contends that all members of this group possess unique knowledge concerning issues at the heart of Assured's claims, such as the failings of the originators.   (UBS Memo. at 11).

Mr. DiRende's involvement has related exclusively to settlement discussions with UBS at the direction of and in conjunction with in-house counsel.  (Declaration of Michael DiRende dated Feb. 15, 2013 ("DiRende Decl."), ¶¶ 3-5).   The e-mails UBS relies on to suggest otherwise fail to connect Mr. DiRende to the Transactions outside the settlement context.[2]   Therefore, the only unique, relevant documents Mr. DiRende is reasonably likely to possess are those related to settlement discussions.   Such documents are beyond the scope of discovery.   See Thornton v. Syracuse Savings Bank, 961 F.2d 1042, 1046 (2d Cir. 1992) (affirming denial of discovery regarding settlement of ongoing

---

[2] UBS relies on three e-mails to suggest that Mr. DiRende's role was not limited to settlement negotiations. (UBS Memo. at 13 n.15). However, UBS's reliance on the e-mails is misplaced. One concerns lunch plans and whether Mr. DiRende has a contact at U.S. Bank.  (E-mail dated March 3, 2011, attached as Exh. 24 to Declaration of Scott D. Musoff dated Feb. 5, 2013 ("Musoff Decl. I")).   That email contains no substantive discussion about the Transactions, and Mr. DiRende never refers to them.  The other e-mails merely reflect Mr. DiRende's limited role in workouts generally and do not concern the Transactions. (E-mails dated Nov. 3, 2009, attached Exh. 25 to Musoff Decl. I; E-mails dated Feb. 4, 2009 and Feb. 5, 2009, attached as Exh. 26 to Musoff Decl. I).

litigation as "necessary to prevent parties from learning their opponents' strategies").

UBS fails to demonstrate that the remaining proposed custodians possess relevant documents that are not also within the custody of the three named custodians. It has merely identified documents in their possession regarding the RMBS market in general that are unrelated to the Workout Committee, let alone to the Transactions.

As to Mr. Bailenson, Mr. Mills, and Mr. Schozer, UBS points to their receipt of a monthly surveillance memorandum. (Memorandum dated Sept. 16, 2009, attached as Exh. 15 to Musoff Decl. I). However, this memorandum was also sent to individuals outside the Workout Committee and refers to well over one hundred deals, including only one of the Transactions. The receipt of such a memorandum hardly demonstrates that Mr. Bailenson, Mr. Mills, and Mr. Schozer were, as UBS alleges, "active participants in Assured's post-closing review and loss mitigation efforts." (UBS Memo. at 11). Likewise, for Mr. Raab, UBS points to his biography pulled from Assured's website. (Press Release dated May 4, 2010, attached as Exh. 23 to Musoff Decl. I). But that document only indicates that he plays a role in "RMBS loss mitigation and risk remediation," with no particular reference to the Transactions. (UBS Memo. 12-13). These materials do not support UBS's

speculation that these individuals may possess additional relevant documents.

Further, the materials proffered by UBS relating to Mr. Albert and Mr. Frederico (UBS Memo. at 11) only demonstrate their knowledge and involvement in the RMBS market in 2008 and have no connection to the Transactions. I had already rejected discovery of Assured's general knowledge of the RMBS market as "too tenuously related to any plausible defense to be a proper subject of discovery." Assured, 2012 WL 5927379, at *4. Thus, UBS has produced nothing more than "mere speculation that responsive [documents] might exist in order for th[e] Court to compel the searches and productions requested." Garcia v. Tyson Foods, Inc., Civ. A. No. 06-2198, 2010 WL 5392660, at *14 (D. Kan. Dec. 21, 2010) (emphasis omitted).

Assured estimates that the e-mails of the individuals from whom UBS now seeks to compel production number over three million. (Declaration of Adam M. Abensohn dated Feb. 19, 2013 ("Abensohn Decl. II"), ¶ 17). This will require it to review hundreds of thousands more documents, bringing its total review to over three-quarters of a million documents. (Absehnson Decl. II, ¶¶ 13-17). Although the total number of documents to be reviewed, by itself, does not warrant curtailing discovery, requiring a search of the files of these custodians cannot be justified given the minimal

13

marginal value of the information sought.  See Treppel, 249 F.R.D. at 117.

### 3.   Documents Concerning Originators

UBS moves to compel Assured to produce discovery concerning the originators through the date of the filing of the Complaint. Assured contends that the search period should not extend beyond June 30, 2007.  I previously concluded that "information about Assured's knowledge of the originator's underwriting policies" is relevant to UBS's equitable defenses and therefore discoverable. Assured, 2012 WL 5927379, at *4.  The parties have also agreed upon the search terms to identify responsive documents.  (UBS Memo. at 13).

UBS fails to demonstrate how discovery beyond June 30, 2007 -- two and one-half months after the last Transaction -- will generate documents relevant to its equitable defense.  It simply relies on the November 21 Order that provided, "Documents that post-date the transactions may nevertheless relate back to the state of affairs as it existed at the crucial time." Assured, 2012 WL 5927379, at *2. However, that statement related to discovery sought by Assured and had nothing to do with UBS's discovery request regarding the originators.

Further, on the last motion, when UBS sought discovery regarding the originators, it represented to the Court that the

14

search should be confined to "the limited timeframe around the deal[s]." (Hearing Transcript dated Nov. 20, 2012 ("Tr.") at 43). It argued that the documents generated during that period would reveal what Assured knew about these originators and would be relevant to its equitable defenses. (Tr. at 33).[3] It has not now provided any justification for obtaining the documents generated after this period. Thus, UBS has not met its burden of demonstrating relevance for the documents that post-date the Transactions. See Mandell v. The Maxon Co., No. 06 Civ. 460, 2007 WL 3022552, at *1 (S.D.N.Y. Oct. 16, 2007).

Therefore, UBS's motion to compel discovery concerning the originators up to the date of the Complaint is denied. The search period shall be limited to the period between September 1, 2006, and June 30, 2007 (two and one-half months before the initial Transaction and one and one-half months after the last).

B.   Discovery Sought by Assured

Assured seeks to compel UBS to produce documents of the Repurchase Custodians, a group created to conduct retroactive

---

[3]   The Court's ruling was based, in part, on this representation. (Tr. 33 ("And in terms of the breadth of what we are talking about, we're not asking for every document about the business. . . . [B]ut if they have analysis of American Home Mortgage for example, that reveal what they thought were the risks or perhaps even deviations from underwriting guidelines, and yet they still insured American Home Mortgage deals. That goes right to the heart of what they're alleging in this case.")).

15

analyses of the Transactions in response to Assured's repurchase requests. I previously concluded that these documents were relevant to Assured's claims. See Assured, 2012 WL 5927379, at *2. UBS now asserts that the vast majority of the documents are protected by the attorney-client privilege and the work product doctrine because they were allegedly created at the direction of outside counsel, Williams & Connolly, in anticipation of litigation.[4] (UBS Memo. at 14-18). UBS also requests permission to use specialized search terms to identify non-privileged documents and to create a categorical privilege log rather than a document-by-document log. (UBS Memo. at 14).

    1.   <u>Work Product</u>

The work product doctrine "shields from disclosure materials prepared 'in anticipation of litigation' by a party or the party's representative, absent a showing of substantial need." <u>United States v. Adlman</u>, 68 F.3d 1495, 1501 (2d Cir. 1995) (quoting Fed R. Civ. P. 26(b)(3)).[5] It is designed to protect "mental impressions, conclusions, opinions or theories concerning litigation." <u>United States v. Adlman</u>, 134 F.3d 1194, 1194 (2d Cir. 1998). A document

_____

    [4] In the November 21 Opinion, I expressly reserved ruling on issues of privilege and work product as they were not properly raised. <u>Assured</u>, 2012 WL 5927379, at *2 n.1.

    [5] Federal law governs the work product doctrine in cases such as this. <u>See, e.g.</u>, <u>Allied Irish Banks, P.L.C. v. Bank of America, N.A.</u>, 252 F.R.D. 163, 173 (S.D.N.Y. 2008).

is prepared "in anticipation of litigation" if "in light of the nature of the documents and the factual situation in the particular case, [it] can fairly be said to have been prepared or obtained because of the prospect of litigation." Id. at 1202 (emphasis in original) (internal quotation marks omitted). Although a document "does not lose protection . . . merely because it is created in order to assist with a business decision," id., "[i]f, regardless of the prospect of litigation, the document would have been prepared anyway, in the ordinary course of business . . . it is not entitled to work product protection," Clarke v. J.P. Morgan Chase & Co., No. 08 Civ. 2400, 2009 WL 970940, at *7 (S.D.N.Y. April 10, 2009) (citing Adlman, 134 F.3d at 1202).

The burden of establishing any right to protection is on the party asserting it.  In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002, 318 F.3d 379, 384 (2d Cir. 2003) (party asserting work product protection faces "heavy" burden).  The protection claimed must be narrowly construed and its application must be consistent with the purposes underlying the asserted immunity.  Id.

UBS argues that the work performed by the Repurchase Custodians is privileged because it was done for the purposes of assisting outside litigation counsel in making judgments about UBS' defenses to this litigation and its legal rights under the PSAs.

(UBS Memo. at 15-16).   Because the Repurchase Custodians began their work after Assured had expressly threatened to litigate in April 2010 (Lantz Decl., ¶¶ 7, 10-11), UBS contends that the work product doctrine protects subsequent actions taken by or at the direction of counsel.   (UBS Memo. at 15).

However, the fact that UBS reasonably anticipated litigation and retained Williams & Connolly does not automatically bring these documents within the scope of work product doctrine.   <u>Adlman</u>, 134 F.3d at 1204; <u>MBIA Insurance Corp. v. Countrywide Home Loans, Inc.</u>, 35 Misc. 3d 1205(A), at *5, 950 N.Y.S.2d 724 (Table) (N.Y. Sup. Ct. Jan. 25, 2011), <u>aff'd</u>, 93 A.D.3d 574, 941 N.Y.S.2d 56 (1st Dep't 2012).   If the materials at issue "would have been prepared in substantially similar form regardless of [] litigation," they are not afforded the protection.   <u>Adlman</u>, 134 F.3d at 1203; <u>see also</u> <u>Clarke</u>, 2009 WL 970940, at *7.

Here, UBS was "contractually obligated to conduct repurchase reviews" under the PSAs governing the Transactions.  (Assured Memo. at 11; Pooling and Servicing Agreement dated Oct. 1, 2006 ("10/1/06 PSA"), attached as Exh. D to Absensohn Decl. I, § 2.03 (setting forth UBS' cure or repurchase obligations under PSAs)).   Thus, UBS would have performed the repurchase analyses even had there been no threat of litigation.   <u>See</u> <u>Genon Mid-Atlantic, LLC v. Stone & Webster, Inc.</u>, No. 11 Civ. 1299, 2011 WL 2207513, at *3 (S.D.N.Y.

18

June 6, 2011) (no work product immunity for documents created "pursuant to rights bargained for in a business contract").

Indeed, UBS concedes that it performed repurchase analyses in the ordinary course of business. "Before . . . August 9, 2010 [when Assured made repurchase demands], repurchase demands were typically evaluated and responded to by non-lawyer transaction managers or other non-lawyer associates and analysts," because these analyses "could often be handled without resorting to legal advice and did not typically raise any litigation issues." (Lantz Decl., ¶ 5). For example, Repurchase Custodian John Lantz is a non-lawyer who reviewed repurchase demands before August 9, 2010, and continued to do so afterwards. (Lantz Decl., ¶¶ 4 (stating that he reviewed "repurchase demands claiming breaches of representations and warranties" before August 9, 2010"), 15). Other UBS documents also indicate that it engaged in repurchase analyses as part of its ordinary business well before any demand by Assured. (E-mail of David Rashty dated July 16, 2007, attached as Exh. A to Abensohn Decl. II (asking John Lantz to "comb thr[ough]" a deal for breaches of representations and warranties)).

The principal case the plaintiff relies on, MBIA, 93 A.D.3d 574, 941 N.Y.S.2d 56, is illuatrative.[6]   There, the Appellate

_____

[6] The law of the Second Circuit, not New York law, governs here.  New York law requires that the party seeking protection

Division held that the documents prepared in the course of a sponsor-bank's analysis of repurchase requests were neither privileged nor work product. <u>MBIA</u>, 93 A.D.3d at 575, 941 N.Y.S.2d at 58. The court found that "processing repurchase requests was an inherent and long-standing part of [the sponsor bank]'s business." <u>Id.</u> The court further noted,

> That a new division was created to respond to plaintiff's repurchase requests, or that litigation appeared imminent is of no moment; defendants were, and always had been, contractually obligated to conduct repurchase reviews and such reviews were, and always had been, conducted by defendant's own staff of underwriters and auditors.

<u>Id.</u>

UBS is in essentially the same position as Countrywide, the sponsor-bank in <u>MBIA</u>. Like Countrywide, UBS is an RMBS sponsor-bank which was contractually obligated to conduct repurchase reviews under the PSAs governing the Transactions. (10/1/06 PSA, § 2.03). And, like Countrywide, UBS had undertaken repurchase analyses in the ordinary course of business, well before Assured made the repurchase demands.

Thus, UBS has failed to demonstrate that the work performed by

--------

establish that the documents were created "<u>primarily</u> for the purpose of litigation," <u>MBIA</u>, 35 Misc. 3d 1205(A), at *6, 950 N.Y.S.2d 724 (Table), where the Second Circuit requires that the documents be created "<u>because of</u>" anticipated litigation, <u>Adlman</u>, 134 F.3d at 1198-99. While I recognize that the Second Circuit's "<u>because of</u>" standard affords broader protection, <u>MBIA</u> is still illustrative as it presents very similar facts.

the Repurchase Custodians was <u>because of</u> litigation, and that the repurchase documents would reveal the "mental impressions, conclusions, opinions, or theories" of attorneys in preparation of litigation.  The mere fact that outside counsel and consultants were retained to assist the repurchase review is insufficient to shield all of the repurchase documents from discovery.  <u>See</u> <u>Genon</u>, 2011 WL 2207513, at *3 (even where consultant "is retained in anticipation of litigation, . . . the [consultant's work] will not be protected where the documents would have been created in essentially similar form irrespective of litigation"); <u>MBIA</u>, 93 A.D.3d at 575, 941 N.Y.S.2d at 58 (repurchase documents are not work product even though counsel assisted in determining legal strategies for responding to monoline repurchase demands).  The fact that these repurchase demands were "unprecedented" in size and scope does not place these materials outside the ordinary course of business for the purposes of work product protection.  What is dispositive is that UBS would have prepared these analyses absent any threat of litigation because they were obligated to do so as part of their ordinary business, pursuant to a contract.

If UBS can point to any documents authored by William & Connolly or its agents that were "specifically directed to litigation strategy or possible litigation defenses[,] under <u>Adlman</u>, these [documents] would fall within work product

21

protection, because they would not have been produced in the form irrespective of the threat of litigation." <u>United States Fidelity & Guaranty Co. v. Braspetro Oil Services Co.</u>, Nos. 97 Civ. 6124, 98 Civ. 3099, 2000 WL 744369, at *9 (S.D.N.Y. June 8, 2000).  It may produce a privilege log for such documents as described below.

2.   <u>Attorney-Client Privilege</u>

The attorney-client privilege shields only "confidential communications made between a client and his attorney for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship and that are primarily or predominantly of a legal character." <u>Gruss v. Zwirn</u>, 276 F.R.D. 115, 123 (S.D.N.Y. 2001) (internal quotation marks omitted).[7]  The privilege "ensure[s] that one seeking legal advice will be able to confide fully and freely in his attorney." <u>D'Alessio v. Gilbert</u>, 205 A.D.2d 8, 10, 617 N.Y.S.2d 484, 485 (2d Dep't 1994).  While this privilege protects confidential communications "relating to their legal matters," there is no such protection for communications that relate primarily to business matters. <u>Rossi v. Blue Cross & Blue Shield of Greater New York</u>, 73 N.Y.2d 588, 592-93, 542 N.Y.S.2d 508, 509 (1989).

As discussed, the documents at issue mostly relate to ordinary

---

[7] New York law governs attorney-client privilege in cases such as this, where state law provides the rule of decision. Fed. R. Evid. 501.

business matters.  Further, the vast majority of documents Assured seeks involve communications between UBS businesspeople -- not "communications between a client and his counsel."  There is no privilege for communications between non-lawyers merely because they were purportedly "done for the purposes of assisting outside litigation counsel," as UBS argues.  (UBS Memo. at 16).  Further, communications between businesspeople and in-house counsel are not automatically shielded from discovery.  See AIU Insurance Co. v. TIG Insurance Co., No. 07 Civ. 7052, 2008 WL 4067437, at *6 (S.D.N.Y. Aug. 28, 2008) ("[W]here in-house counsel also serves as a business advisor within the corporation, only those communications related to legal, as contrasted with business, advice are protected."); ABB Kent-Taylor v. Stallings & Co., 172 F.R.D. 53, 58 (W.D.N.Y. 2006) ("[T]here is no privilege for corporate counsel who is giving, or corporate employees who are seeking, predominantly business advice.").  Therefore, a substantial amount of these documents would not be protected under the attorney-client privilege.

As with work product, UBS may produce a privilege log of documents for which it claims attorney-client privilege consistent with this opinion.

     3.  <u>Privilege Log</u>

UBS proposes developing a protocol to identify samples of

privileged documents and to generate a categorical privilege log rather than a document-by-document log.  (UBS Memo. at 18-19; UBS Resp. at 9).  UBS asserts that "logging every single privileged e-mail, e-mail attachment and hard copy document created or received by these custodians would impose an enormous burden and expense upon UBS." (UBS Memo. at 19).  Federal Rule of Civil Procedure 16 and Local Civil Rule 26.2 committee note recognize this burden, and courts in this district have endorsed a categorical approach in providing a privilege log to reduce such burden.[8]  <u>See, e.g.</u>, <u>American Broadcasting Cos. v. Aereo, Inc.</u>, No. 12 Civ. 1540, 2013 WL 139560, at *2 (S.D.N.Y. Jan. 11, 2013) (encouraging parties to consider various alternatives to wholesale review, including limiting production to subsets of documents, excluding likely work product, and submitting categorical log); <u>Pippins v. KPMG LLP</u>, No. 11 Civ. 0377, 2011 WL 4701849, at *9 (S.D.N.Y. Oct. 7, 2011) (encouraging sampling to alleviate discovery costs); <u>S.E.C. v. Collins & Aikman Corp.</u>, 256 F.R.D. 403, 418 (S.D.N.Y. 2009) ("The concept of sampling to test both the cost and the yield is now part of the mainstream approach to electronic discovery.").

_____

[8] In all of the cases cited by Assured, the parties initially prepared categorical logs.  <u>See, e.g.</u>, <u>Fleisher v. Phoenix Life Insurance Co.</u>, No. 11 Civ. 8405, 2013 WL 42374, at *3 (S.D.N.Y. Jan. 3, 2013); <u>Chevron Corp. v. Salazar</u>, No. 11 Civ. 3718, 2011 WL 4388326, at *1 (S.D.N.Y. Sept. 20, 2011); <u>In re Rivastigmine Patent Litigation</u>, 237 F.R.D. 69, 87 (S.D.N.Y. 2006).

Therefore, UBS's motion to identify privileged documents by category is granted.  It shall produce a privilege log of documents protected by work product and attorney-client privilege consistent with this opinion.  Should there arise a dispute regarding categorization of documents, the parties may submit them for _in camera_ review, and I may order the documents to be recategorized. Moreover, if the producing party mischaracterizes a document, I may find waiver or shift the costs and attorneys' fees incurred by the party seeking such review to the extent deemed appropriate.

<u>Conclusion</u>

For the reasons set forth above, Assured's motion to compel (Docket no. 53) is granted to the extent that UBS shall produce relevant documents from the Repurchase Custodians.  UBS' motion (Docket no. 54) is granted to the extent that it may provide a categorical privileged log for the documents from the Repurchase Custodians.  In all other respects, the motions are denied.

SO ORDERED.



JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       March 25, 2013

25

Copies mailed this date to:

Phillippe Z. Selendy, Esq.
Adam M. Abensohn, Esq.
Nicholas F. Joseph, Esq.
Sean P. Baldwin, Esq.
Paul Riley, Esq.
Quinn Emanuel Urquhart & Sullivan
51 Madison Avenue
New York, NY 10010

Deborah R. Gross, Esq.
Law Offices Bernard M Gross, P.C.
Suite 450, 100 Penn Square East
Philadelphia, PA 19107

Judith L. Spanier, Esq.
Abbey Spanier Rodd & Abrams, LLP
212 East 39th Street
New York, NY 10016

Jay B. Kasner, Esq.
Robert A. Fumerton, Esq.
Scott D. Musoff, Esq.
Paul J. Lockwood, Esq.
Alexander C. Drylewski, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
42nd Floor
New York, NY 10036

Allen J. Ruby, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Palo Alto, CA 94301

David Spears, Esq.
Max C. Nichols, Esq.
Christopher W. Dysard, Esq.
Spears & Imes LLP
51 Madison Ave.
New York, NY 10010

26